**FILED**

December 23 2009

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 08-0399

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 440

CARY ROHLFS and TERRA ROHLFS,

      Plaintiffs and Appellants,

  v.

KLEMENHAGEN, LLC, d/b/a STUMBLE INN,

      Defendant and Appellee.

| | |
|---|---|
| APPEAL FROM: | District Court of the Twenty-First Judicial District, In and For the County of Ravalli, Cause No. DV 07-355 Honorable James A. Haynes, Presiding Judge |

COUNSEL OF RECORD:

      For Appellants:

            David R. Paoli (argued), John Kutzman, Paoli, Latino & Kutzman, Missoula, Montana

      For Appellee:

            Patrick HagEstad (argued), Christopher Decker (argued), Milodragovich, Dale, Steinbrenner & Nygren, Missoula, Montana

                Argued:    June 10, 2009
                Submitted: June 16, 2009
                Decided:   December 23, 2009

Filed:

_____
                    Clerk

Justice John Warner delivered the Opinion of the Court.

¶1     Plaintiffs Cary and Terra Rohlfs brought suit against Klemenhagen, L.L.C., doing business as the Stumble Inn, to recover damages incurred as the result of an automobile accident involving a patron of the Stumble Inn. The Twenty-First Judicial District Court, Lake County, granted Stumble Inn's motion to dismiss based on a provision of Montana's Dram Shop Act, § 27-1-710(6), MCA, that requires a claimant give notice to the potential defendant of intent to sue to within 180 days of the alleged furnishing alcohol to an intoxicated person. The Rohlfs appeal. The issues raised are:

¶2     Issue 1: Is § 27-1-710(6), MCA, special legislation prohibited by Article V, Section 12, of the Montana Constitution?

¶3     Issue 2: Is § 27-1-710(6), MCA, unconstitutional as a violation of equal protection of the law required by Article II, Section 4, of the Montana Constitution?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4     One evening in June 2006, Joseph Warren left the Stumble Inn tavern after several hours of drinking. Shortly thereafter, while driving his pickup truck, he collided with an automobile driven by Cary Rohlfs, causing Rohlfs severe injuries. Montana Highway Patrol officers investigating the accident observed that Warren smelled of alcohol and a test revealed that his blood alcohol level was 0.14, indicating his ability to drive was impaired by alcohol. Warren pled guilty to the offense of negligent vehicular assault. Stumble Inn does not contest in this appeal that Warren, at least in part, tortiously caused the accident and Rohlfs' resulting injuries. Both the Rohlfs and employees of the

2

Stumble Inn knew immediately after the accident that Warren had been drinking alcohol at that bar just before he caused the accident.

¶5 A little over a year after the accident, in July 2007, the Rohlfs filed their complaint, alleging Stumble Inn is liable to them for the injuries caused by Warren because its employees served alcohol to him shortly before the accident while he was visibly intoxicated, in violation of § 27-1-710(3)(b), MCA. Stumble Inn moved to dismiss the complaint based on § 27-1-710(6), MCA, that provides:

> A civil action may not be commenced under this section against a person who furnished alcohol unless the person bringing the civil action provides notice of an intent to file the action to the person who furnished the alcohol by certified mail within 180 days from the date of sale or service. The civil action must be commenced pursuant to this section within 2 years after the sale or service.

¶6 In response to the motion to dismiss, the Rohlfs concede they did not give the notice required by § 27-1-710(6), MCA, to Stumble Inn within 180 days. The Rohlfs argued to the District Court that the notice provision may not be enforced because it is unconstitutional special legislation and violates their right to equal protection of the law. The District Court granted the motion to dismiss. On appeal, the Rohlfs reiterate their special legislation and equal protection claims.

## STANDARDS OF REVIEW

¶7 Statutes are presumptively constitutional. *City of Billings v. Albert*, 2009 MT 63, ¶ 11, 349 Mont. 400, 203 P.3d 828. A person challenging a statute's constitutionality bears the burden of proving it unconstitutional beyond a reasonable doubt. *Eklund v. Wheatland County*, 2009 MT 231, ¶ 14, 351 Mont. 370, 212 P.3d 297. The

3

constitutionality of a statute is a question of law and we review the district court's application of the Constitution for correctness. Our review of constitutional questions is plenary. *City of Billings*, ¶ 11.

¶8 The question of whether a district court properly granted a motion to dismiss is a conclusion of law that we review for correctness. *Public Lands Access Assn., Inc. v. Jones*, 2008 MT 12, ¶ 9, 341 Mont. 111, 176 P.3d 1005.

## DISCUSSION

¶9 *Issue 1: Is § 27-1-710(6), MCA, special legislation prohibited by Article V, Section 12, of the Montana Constitution?*

¶10 The Montana Constitution provides:

> The legislature shall not pass a special or local act when a general act is, or can be made, applicable.

Mont. Const. art. V, § 12.

¶11 Rohlfs makes no "as applied" constitutional challenge to § 27-1-710(6), MCA. The central point of the Rohlfs' argument is that § 27-1-710(6), MCA, is prohibited special legislation as there is nothing unique about cases against bar owners under the Dram Shop Act, as compared to negligence cases generally, which makes evidence and witnesses more likely to disappear quickly. Thus, the Rohlfs assert the 180-day notice provision in § 27-1-710(6), MCA, has singled out "dram shop plaintiffs" for a unique procedural disability that is arbitrary and does not arise from any distinction that can withstand constitutional muster.

4

¶12 In the constitutional context, a law is not local or special if it operates in the same manner upon all persons in like circumstances. If a law operates uniformly and equally upon all brought within the circumstances for which it provides, it is not a local or special law. *Lowery v. Garfield County*, 122 Mont. 571, 586, 208 P.2d 478, 486 (1949). On the other hand, a law is special legislation if it confers particular privileges or disabilities upon a class of persons arbitrarily selected from a larger group of persons, all of whom stand in the same relation to the privileges or disabilities.

> A special statute is one which relates to particular persons or things of a class, or one made for individual cases and for less than a class, or one which relates and applies to particular members of a class, either particularized by the express terms of the act or separated by any method of selection from the whole class to which the law might, but for such limitation, be applicable.

*Lowery*, 122 Mont. at 587, 208 P.2d at 487 (internal citations omitted).

¶13 Class legislation may be constitutional if the class established is germane to the purpose of the law and is characterized by some special qualities or attributes which reasonably render the legislation necessary. In other words, if the classification is reasonable and the law operates equally upon every person or thing within the given class, it is not unconstitutional. *State ex rel., Fisher v. School Dist. No. 1*, 97 Mont. 358, 366-67, 34 P.2d 522, 525-26 (1934). Reasonable classifications of persons will be upheld against a special legislation challenge. *Linder v. Smith*, 193 Mont. 20, 30, 629 P.2d 1187, 1192 (1981). A presumption exists in favor of a law being constitutional and the classification being reasonable. *Great Falls Nat. Bank v. McCormick*, 152 Mont. 319, 323, 448 P.2d 991, 993 (1968).

5

¶14     Section 27-1-710(6), MCA, does set up a class: those who seek to recover from a person or entity who furnished alcohol to a visibly intoxicated person who later caused an injury.  This does not mean the statute is unconstitutional.  It is constitutional if the established class is reasonable and treats all those equally that are within the class.  *Great Falls Nat. Bank*, 152 Mont. at 323, 448 P.2d at 993 (citing *State v. Safeway Stores, Inc.*, 106 Mont. 182, 76 P.2d 81 (1938)).

¶15     At common law, a purveyor of alcohol could not be held liable for injuries caused to a third party by his intoxicated patron or guest.  The reason behind this rule was the idea that the consumption, rather than the furnishing of the alcoholic beverage, proximately caused the injury.  *Nevin v. Carlasco*, 139 Mont. 512, 514-15, 365 P.2d 637, 638 (1961).  However, in *Nehring v. LaCounte*, 219 Mont. 462, 471, 712 P.2d 1329, 1335 (1986) (overruling *Runge v. Watts*, 180 Mont. 91, 589 P.2d 145 (1979)), this Court held that to exempt a purveyor of alcohol from liability without regard to his own negligence or fault was a Neanderthal approach to dram shop liability and rejected the common law rule.

¶16     After *Nehring*, the Legislature enacted § 27-1-710, MCA, commonly referred to as the Dram Shop Act, with the stated purpose to set statutory criteria governing the liability of a person or entity that furnishes an alcoholic beverage for injury or damage arising from an event involving the person who consumed the beverage.  Section 27-1-710(1), MCA.  In 2003, the Fifty-eighth Legislature enacted subsection (6) of the statute, adding the 180-day notice requirement the Rohlfs now attack.

6

¶17 In this instance, the legislative history reveals what motivated the Legislature to add the notice provision in question. In summary, the proponents of the notice requirement testified it is oftentimes difficult, if not impossible, to gather and preserve evidence concerning an event where a potential defendant was not present and may not be aware created potential liability. The legislators were also told that insurance coverage for liability created by the Dram Shop Act was not readily available because the gathering of evidence and location of witnesses was difficult. The Legislature accepted these arguments, and in its wisdom decided the 180-day notice requirement was appropriate to help alleviate the problem. Thus, it adopted subsection (6) to fix a time within which notice of a claim must be given, so that recollections are reasonably intact and witnesses are still available.

¶18 The dissent passionately disagrees with the Legislature's policy decision to create a class of tort defendants that serve alcohol and then establish a shorter period within which members of that class may commence a lawsuit. However, the fact finding process and motivation of legislative bodies is entitled to a presumption of regularity and deferential review by the judiciary. 16A Am. Jur. 2d *Constitutional Law* § 271 (1998) (citing *Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 105 S. Ct. 3180 (1985)). It is not the function of the courts to second-guess the legislature and substitute their judgment on the policy of limiting the ability to bring suit against one who furnishes alcoholic beverages. *See Watters v. Guaranty Nat. Ins. Co.*, 2000 MT 150, ¶ 51, 300 Mont. 91, 3 P.3d 626, *overruled on other grounds*, *Shilhanek v. D-2 Trucking, Inc.*, 2003 MT 122, 315 Mont. 519, 70 P.3d 721; *State Bar of Montana v. Krivec*, 193 Mont. 477,

7

481, 632 P.2d 707, 710 (1981); *Linder,* 193 Mont. at 29, 629 P.2d at 1192. Adherence to this principle is not fawning or groveling before the legislature, it is respect for the role of the policymaking body in our system of government. The courts are limited to a determination of whether it is reasonable to differentiate between the classes created by the legislation in question. Here, those classes are tort claims against a defendant directly involved in the incident causing damage and those where the defendant is not present and may not be aware that an incident occurred until being served with a complaint.

¶19 The class created under § 27-1-710(6), MCA—plaintiffs who utilize a statutory scheme to bring an action against a defendant that is not immediately aware it may be held liable—is germane to the purpose of requiring members of this class notify a potential defendant of their claim. This class of plaintiffs is characterized by the special nature of the Dram Shop Act, which creates a statutory claim that arises even though defendants may not be aware they are alleged to have caused an injury. The notice provision operates equally upon every person who seeks redress under the Dram Shop Act, be it against a bartender, a tavern owner, a club or organization holding some sort of an event, or a social host who has friends to dinner. The wisdom of the notice requirement of § 27-1-710(6), MCA, is subject to debate. However, it operates uniformly and equally upon all brought within the circumstances for which it provides. There is a presumption that the classification is reasonable and that the Legislature acted on legitimate grounds. *Great Falls Nat. Bank*, 152 Mont. at 323, 448 P.2d at 993.

¶20 Although the dissent engages in a lengthy examination of the evidence presented to the legislature to justify passing § 27-1-710(6), MCA, and then finds it insufficient,

8

this Court has no license to psychoanalyze the legislators. *See Wallace v. Jaffree*, 472 U.S. 38, 74, 105 S. Ct. 2479, 2499 (1985) (O'Connor, J., concurring). This Court's role is not to determine the prudence of a legislative decision. *Satterlee v. Lumberman's Mutual Ins. Co.*, 2009 MT 368, ¶ 34, 353 Mont. 265, __ P.3d __. It is for the legislature to pass upon the wisdom of a statute. *McClanathan v. Smith*, 186 Mont. 56, 66, 606 P.2d 507, 513 (1980). We conclude that § 27-1-710(6), MCA, does not, beyond a reasonable doubt, create an unreasonable classification. The statute is not unconstitutional as special legislation prohibited by Article V, Section 12, of the Montana Constitution.

¶21 *Issue 2: Is § 27-1-710(6), MCA, unconstitutional as a violation of equal protection of the law required by Article II, Section 4, of the Montana Constitution?*

¶22 Article II, Section 4, of the Montana Constitution guarantees that "[n]o person shall be denied the equal protection of the laws." The Rohlfs contend that § 27-1-710(6), MCA, denies them equal protection of the law because it unconstitutionally imposes a burden on plaintiffs who bring suit under the Dram Shop Act that is not imposed on other general negligence plaintiffs.

¶23 When presented with an equal protection challenge, we first identity the classes involved and determine whether they are similarly situated. *Farrier v. Teacher's Retirement Bd.*, 2005 MT 229, ¶ 15, 328 Mont. 375, 120 P.3d 390. The basic rule of equal protection "is that persons similarly situated with respect to a legitimate governmental purpose of the law must receive like treatment." *Oberson v. U.S. Dept. of Agric., Forest Service*, 2007 MT 293, ¶ 19, 339 Mont. 519, 171 P.3d 715. If the classes at issue are not similarly situated, the first criterion for proving an equal protection

9

violation is not met, and our equal protection analysis ends. *State v. Egdorf*, 2003 MT 264, ¶ 15, 317 Mont. 436, 77 P.3d 517. Nevertheless, if the classes established are similarly situated, a legislative act is not necessarily unconstitutional because it benefits a particular class, so long as the law operates equally upon those within the class. *Farrier*, ¶ 15.

*A.     Similarly situated*

¶24     The Rohlfs contend that dram shop plaintiffs and general negligence plaintiffs are similarly situated. Stumble Inn contends that purveyors of alcohol—social hosts, tavern owners, charity event planners—are sufficiently different from general negligence defendants, and thus separate treatment is appropriate.

¶25     The purpose of the Dram Shop Act is to set criteria governing the liability of a person or entity that furnishes an alcoholic beverage for injury or damage arising from an event involving the person who consumed the beverage. Section 27-1-710(1), MCA. Subsection (6) of § 27-1-710, MCA, the notice requirement in question, imposes an obligation on persons who allege they are injured as a result of furnishing alcohol. While those who make a claim under the Dram Shop Act must take an additional step before bringing suit, they are still in a similar situation as others who allege injury by the wrongful act or omission of another.

*B.     Level of scrutiny*

¶26     Once classifications have been identified, we next determine which of the established levels of scrutiny is appropriately applied: strict scrutiny, middle-tier scrutiny, or the rational basis test. *Snetsinger v. Montana University System*, 2004 MT 390, ¶ 17,

10

325 Mont. 148, 104 P.3d 445. Strict scrutiny applies if a suspect class or fundamental right is affected. Under the strict scrutiny standard, the government has the burden of showing that the law is narrowly tailored to serve a compelling government interest. *Snetsinger*, ¶ 17. We apply middle-tier scrutiny if the law affects a right conferred by the Montana Constitution, but is not found in the Constitution's Declaration of Rights. *Farrier*, ¶ 16. The rational basis test is appropriate when neither strict scrutiny nor middle-tier scrutiny apply. Under the rational basis test, it is the challenger's burden to show the law is not rationally related to a legitimate government interest. *Snetsinger*, ¶ 19.

¶27 The Rohlfs urge the Court to apply a strict scrutiny analysis to their equal protection claim, by suddenly switching to an argument that § 27-1-710(6), MCA, constitutes a violation of Article II, Section 16, of the Montana Constitution because it closes the courthouse door to a plaintiff who has not given the required notice. Article II, Section 16, of Montana's Constitution guarantees that "[c]ourts of justice shall be open to every person, and speedy remedy afforded for every injury of person, property, or character." The courthouse door was, of course, open to the Rohlfs. It closed only when the required notice was not given within 180 days.

¶28 It is not necessary in this case to reanalyze whether Article II, Section 16, guarantees a fundamental right to a particular cause of action, remedy, or redress for the purpose of deciding if strict scrutiny applies in this case.[1] The Dram Shop Act provides a

---

[1] This issue is exhaustively analyzed in *Meech v. Hillhaven West, Inc.,* 238 Mont. 21, 776 P.2d 488 (1989).

11

remedy upon proof it was violated. The Rohlfs do not attack the legislative alteration of the elements of their claim occasioned by § 27-1-710(3), MCA.

¶29 The notice requirement of § 27-1-710(6), MCA, under examination in this case, is in the nature of a period of limitation placed on the ability to commence a civil action for damages. It does not involve a suspect class or a fundamental right and strict scrutiny is not required. Nor does the notice requirement require middle-tier scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy. *See State of Ariz. v. Sasse*, 245 Mont. 340, 344, 801 P.2d 598, 601 (1990) (citing *Clark v. Jeter*, 486 U.S. 456, 108 S. Ct. 1910 (1988)). The legislature may impose reasonable procedural requirements on available remedies so long as those requirements have a rational basis. *Harrison v. Chance*, 244 Mont. 215, 225, 797 P.2d 200, 206 (1990); *Meech v. Hillhaven West, Inc.*, 238 Mont. 21, 30, 776 P.2d 488, 493 (1989). Access to the courts may be hindered if there is a rational basis for doing so. *Linder*, 190 Mont. at 25-26, 629 P.2d at 1190. The rational basis test applies to analyzing whether a liability limitation imposed through a special statute of limitations violates equal protection. *Reeves v. Ille Elec. Co.*, 170 Mont. 104, 112-13, 551 P.2d 647, 652 (1976).

C.     *Rational Basis Test*

¶30 The Rohlfs ignore the fact that the entirety of § 27-1-710, MCA, applies not only to tavern owners, but to all who might give or sell an alcoholic beverage to another. They argue the Legislature has no rational basis for requiring them to give notice to Stumble Inn within 180 days of serving alcohol to Warren because the proposition that tavern owners somehow have more difficulty preserving potential witness testimony than

12

other negligence defendants is fundamentally flawed. The Rohlfs claim the fundamental flaw is that the Legislature was presented with insufficient evidence that tavern owners have more difficulty locating witnesses and preserving evidence than other defendants in civil actions. According to the Rohlfs, § 27-1-710(6), MCA, is really a gratuitous windfall for the tavern industry.

¶31 The rational basis test requires a law to be rationally related to a legitimate government interest. *Snetsinger,* ¶ 19. What a court may think as to the wisdom or expediency of the legislation is beside the question and does not go to the constitutionality of a statute. The court is to assume that the Legislature was in a position and had the power to pass upon the wisdom of the enactment, and in the absence of an affirmative showing no valid reason existed behind the classification, it is not to be disturbed. *McClanathan*, 186 Mont. at 66, 606 P.2d at 513 (1980) (citing *State ex rel. Hammond v. Hager,* 160 Mont. 391, 399, 503 P.2d 52, 56 (1972). The purpose of the legislation does not have to appear on the face of the legislation or in the legislative history. It may be any possible purpose of which the court can conceive. *Stratemeyer v. Lincoln Co.*, 259 Mont. 147, 152, 855 P.2d 506, 509-10 (1993); *Kottel v. State*, 2002 MT 278, ¶ 55, 312 Mont. 387, 60 P.3d 403.

¶32 The Rohlfs refer the Court to the proceedings before the Senate and House Business and Labor Committees of the Fifty-eighth Legislature where the notice requirement was discussed. It is not for this Court to review the quantity and quality of information that moved the Legislature to act. The Court's task is to examine the result

13

and if the law is rationally related to a legitimate government purpose, it withstands a constitutional challenge.

¶33   It cannot be gainsaid that the government has a legitimate interest in establishing rules for the conduct of litigation and in setting periods of limitation for particular types of claims.  See Title 27, Chapter 2, MCA, *Statutes of Limitations*.[2]  While it is not necessary that the rationale behind a particular statute be apparent on its face in order for it to pass constitutional muster, in this case the rationale is known.  In an action under the Dram Shop Act, the plaintiff has the burden of proof.  Nevertheless, the plaintiff has immediate knowledge of the incident and the ability to begin an investigation and preserve evidence.  On the other hand, the defendant most likely was not present at the incident and may not know an incident occurred.  The people's representatives determined it is appropriate that a potential defendant should have notice of a possible claim within six months, so that he, she, or it could, like a plaintiff, locate witnesses and preserve potential evidence.  There is a rational basis for the 180-day notice requirement.

¶34   Other special periods of limitation have survived an equal protection challenge.  In a discrimination context, this Court held that 180-day statute of limitations was a rational way preventing stale claims and ensuring that claims are filed before essential evidence disappears.  *Harrison*, 244 Mont. at 225, 797 P.2d at 206.  Concerning medical malpractice claims by a minor, this Court held that a statute of limitations that applied only to minors had a rational basis and did not violate Article II, Section 4—the equal

---

[2]   Scattered throughout the Montana Code Annotated there are many periods of limitation which are too numerous to mention.

14

protection clause of the Montana Constitution. *Estate of McCarthy v. Montana Second Judicial Dist. Court, Silver Bow Co.*, 1999 MT 309, ¶ 19, 297 Mont. 212, 994 P.2d 1090.

¶35 We conclude that § 27-1-710(6), MCA, is rationally related to a legitimate government purpose and therefore does not violate Article II, Section 4, of the Montana Constitution.

## CONCLUSION

¶36 Section 27-1-710(6), MCA, is not invalid as special legislation and does not deny the Rohlfs equal protection of the law. The judgment of the District Court is affirmed.


/S/ JOHN WARNER


We Concur:

/S/ MIKE McGRATH
/S/ JIM RICE



Justice Brian Morris concurs.

¶37 I concur with the Court's decision to affirm the judgment of the District Court. Rohlfs's motion for summary judgment presented a facial challenge to the notice provision contained in § 27-1-710(6), MCA. Rohlfs made no as applied challenge to the statute. ¶ 11. Rohlfs's motion for partial summary judgment alleged simply that "the notice statute upon which Stumble Inn relies is unconstitutional." Rohlfs concede that they failed to comply with the 180-day notice provision. The notice provision serves to

15

provide an opportunity for purveyors of alcohol to collect and preserve evidence regarding an accident alleged to have occurred as a result of the purveyor's negligent serving of alcohol. Section 27-1-710(6), MCA.

¶38 In this instance, however, the employees of the Stumble Inn knew immediately after the accident that Warren had been drinking at the Stumble Inn for the 11 hours preceding the accident. ¶ 4. This fact raises the question of whether the notice provision's purpose had been served. In other words, the employees of the Stumble Inn likely had passed along to the principals of Klemenhagen, L.L.C., d/b/a Stumble Inn, the fact that one of its patrons had loaded up at the bar before plowing into an unsuspecting driver on Highway 93. Whether this constructive notice blossomed into actual notice presented a question of fact that Rohlfs did not explore.

¶39 Rohlfs instead chose to pursue a facial challenge to the notice provision in its motion for partial summary judgment. Rohlfs raised no issue at the hearing on summary judgment as to whether the principals of Klemenhagen, L.L.C., d/b/a Stumble Inn had actual notice of the accident in light of the information contained in the accident report that the investigating police officers had interviewed employees of the Stumble Inn right after the accident. The District Court asserted at the outset of the hearing that no genuine issues of material fact existed. Neither party disputed the court's assertion. Rohlfs also phrase their challenge on appeal broadly as a facial challenge to the notice provision.

¶40 I would have been willing to consider an as applied challenge to the notice provision in light of the fact that the principals of Klemenhagen, L.L.C. d/b/a Stumble Inn likely had actual knowledge of the accident and its role in serving alcohol to Warren

16

in the 11 hours preceding the accident almost immediately after the accident. Rohlfs's formal notice under § 27-1-710(6), MCA, simply would have informed these principals what they already knew. The principals likely could not have demonstrated prejudice from the Rohlfs's failure to comply strictly with the notice provision under those circumstances. Compliance with the notice provision under those circumstances would have been a useless act. It is axiomatic that "neither law nor equity require useless acts." *Stockman Bank of Mont. v. Mon-Kota, Inc.*, 2008 MT 74, ¶ 41, 342 Mont. 115, 180 P.3d 1125.

/S/ BRIAN MORRIS

Justice W. William Leaphart, dissenting.

¶41 I dissent. As the Court's opinion notes, the purpose of § 27-1-710(6), MCA, is to provide a purveyor of alcohol notice of a potential claim arising out of an incident at which the purveyor "most likely was not present." Opinion, ¶ 33. Under the facts of the present case, it is clear that the Stumble Inn was, in fact, on notice of the incident. Its employees were very much aware of Warren's consumption of alcohol while at the Inn and, more importantly, were aware that, upon leaving the Inn, he got in his car and was involved in a serious automobile accident within 150-some feet of the Inn. One of the Inn's bartenders (Lisa Foley) was interviewed that night and told the investigating Sergeant that Warren had about a beer an hour throughout her shift, which began at 6

17

p.m. and then had a shot for a nightcap as she was closing around 1 a.m. She had encouraged Warren to call for a ride or get a taxi, but he refused.

¶42 Although Rohlfs did not provide notice within 180 days, as required by § 27-1-710(6), MCA, such notice would have been entirely superfluous since the Inn, through its employees, was aware of the incident shortly after it occurred. As the Court recognizes, the purpose of the statute is to provide purveyors of alcohol sufficient opportunity to "locate witnesses and preserve potential evidence." Here, the Stumble Inn, whose employee/bartender was interviewed that night, was not denied that opportunity. If anything, the Inn was in a better position to begin gathering evidence than Cary Rohlfs, who was seriously injured. Neither law nor equity require useless acts. *Stockman Bank of Mont. v. Mon-Kota, Inc.*, 2008 MT 74, ¶ 41, 342 Mont. 115, 132, 180 P.3d 1125, 1137. Had Rohlfs given the required notice within the 180 days, Stumble Inn's ability to gather evidence would not have been any better than it was a few hours after the incident.

¶43 As argued by the Rohlfs, it is evident from the law enforcement interview and public court records that the passage of time has not hindered the investigation and development of the facts.

/S/ W. WILLIAM LEAPHART

Justice Patricia O. Cotter dissents.

¶44 Though I do not join Justice Nelson's Dissent verbatim, I strongly agree with his well-reasoned conclusion that § 27-1-710(6), MCA, is special legislation prohibited by

18

Article V, Section 12 of the Montana Constitution. In this connection, I fully concur with his observations set forth in ¶¶ 101-111. Legislative insulation of those who provide alcohol to intoxicated persons from the operation of law applicable to all other tortfeasors is an indefensible particular privilege prohibited by our Constitution. The notice provision also constitutes an indefensible disability imposed upon those unfortunate enough to be the victims of drunk drivers.

¶45 I write to address the notice provision from the perspective of the victim. As noted by Justice Nelson, a special law which imposes "peculiar disabilities" upon an arbitrary class of persons is also considered special legislation. *Leuthold v. Brandjord*, 100 Mont. 96, 105, 47 P.2d 41, 45 (1935). It bears repeating that Article V, Section 12 of the Montana Constitution provides that the Legislature shall not pass a special act "when a general act is, or can be made, applicable." For the many decades before this notice provision came into being, the statutes of limitations operated generally, uniformly, and successfully upon all tort victims, regardless of whether their injuries stemmed from negligence or recklessness. There is absolutely nothing in the legislative history demonstrating that the general act could no longer "be made applicable" to the particular class of persons victimized by overserved intoxicated persons. If Article V, Section 12 is to mean anything, it must mean that if the general law works, then no special act should be passed. The general law has always worked; therefore, the Legislature violated this constitutional precept when it passed a special act disadvantaging victims of overserved drunk drivers.

¶46 The notice provision is plainly unconstitutional special legislation. I would therefore reverse the order of the District Court and remand this case for trial on its merits. I dissent from our refusal to do so.

/S/ PATRICIA O. COTTER

Justice James C. Nelson, dissenting.

## I. INTRODUCTION

¶47 Today, this Court ably demonstrates what it means to decide a case, "not pursuant to the judicial duty of applying the law, but by [reaching] a result that accords with its will."[1] The 180-day notice provision of § 27-1-710(6), MCA, is unconstitutional special legislation, plain and simple. The 2003 Legislature admittedly bestowed this privilege on a small subset of negligence defendants—those who allegedly served alcoholic beverages to underage or visibly intoxicated consumers—so that these defendants would have a special defense to civil claims which other, similarly situated negligence defendants do not have. Conversely, those who are injured by these defendants' negligent conduct have an extra burden in obtaining a remedy—a burden which other, similarly situated plaintiffs do not have. This is quintessential special legislation; and in holding otherwise, the Court "gives mere lip service" to the constitutional provisions and then "twists the provisions

_____

[1] *In re L.F.A.*, 2009 MT 363, ¶ 26, 353 Mont. 220, ___ P.3d ___ (Rice, J., concurring).

20

. . . to reach the desired conclusion"[2] that legislation specially enacted to give special protection to an apparently special group is not "special" itself.

¶48 This remarkable conclusion is all the more egregious when viewed in context. Stumble Inn served alcoholic beverages to one of its patrons for eleven hours. Stumble Inn's visibly intoxicated patron then "stumbled out" of the bar, got into his car, peeled out of the parking lot, and slammed into Cary Rohlfs. According to witnesses, Cary had no time to avoid the collision, from which he suffered serious injuries. Yet, solely because Cary did not give Stumble Inn notice, within 180 days, of an intent to file the present action, the Court holds that the case must be dismissed, that Cary must be denied his day in court, and that Stumble Inn does not have to answer for its actions. As the public is likely to conclude, and rightly so, Stumble Inn "got off on a technicality."

¶49 Worse still, the purpose of the notice requirement is not even being served here. It was adopted so that a purveyor of alcoholic beverages who was not present at an injury-producing incident involving one of its patrons, and thus may not be aware that the incident occurred, has the opportunity to gather and preserve evidence, locate and interview witnesses, and prepare a defense to a claim arising out of the incident. Yet, the accident here occurred only a stone's throw from Stumble Inn's front door, Stumble Inn employees were fully aware of the accident and of their drunken patron's involvement, and Stumble Inn therefore was on notice that it ought to gather evidence and interview

---

[2] *Klein v. State ex rel. Dept. of Corrections*, 2008 MT 189, ¶ 46, 343 Mont. 520, 185 P.3d 986 (Warner, J., dissenting).

witnesses.[3] I agree that under these circumstances, compliance with the notice provision would have been a "useless act" (*see* Concurrence ¶ 40; Dissent, ¶ 42), something that neither law nor equity requires. *Stockman Bank of Montana v. Mon-Kota, Inc.*, 2008 MT 74, ¶ 41, 342 Mont. 115, 180 P.3d 1125. Moreover, Stumble Inn has made no showing that it is unable to mount a defense to the Rohlfs' claims due to their failure to provide the 180-day notice; and Stumble Inn's ongoing insistence that it required such notice is, therefore, particularly ludicrous. Stumble Inn's argument also ignores a critical fact: It is *the plaintiff* who must prove that the bar served the driver while he was visibly intoxicated. Indeed, here, it is the Rohlfs' burden, not Stumble Inn's, to find the witnesses and gather the evidence.

¶50 Even more to the point of the Rohlfs' constitutional challenge, there is no evidence anywhere in the record supporting the proposition that alcohol purveyors have a special need (in comparison to similarly situated tort defendants) to know that they are going to be sued so that they might gather evidence and interview witnesses. In point of fact, Stumble Inn was in a better position to know that it might be sued and to prepare its defense than a distant tire manufacturer would have been had the accident been caused by defective tires. Yet, while the Rohlfs could hold the tire manufacturer responsible for placing a defective product in the stream of commerce, they are denied their right to hold

---

[3] Regarding the Concurrence's suggestion in ¶ 38 that the principals of Stumble Inn might not have had notice of the accident, I note that its employees were aware of the accident, that an employee is an agent of her employer, *Fandrich v. Capital Ford Lincoln Mercury*, 272 Mont. 425, 430, 901 P.2d 112, 115 (1995), and that a principal is deemed to have notice of all information known by his agent that the agent, in good faith and exercising due care and diligence, should have communicated to the principal, *Kaeding v. W.R. Grace & Co.-Conn.*, 1998 MT 160, ¶ 26, 289 Mont. 343, 961 P.2d 1256.

Stumble Inn responsible for loading up its patron with alcohol for eleven hours and then unleashing him on unsuspecting motorists. Stumble Inn will certainly be delighted to learn that this Court has endorsed the special legislation mandating this result.

¶51    The supreme irony of the Court's decision is that as this Opinion is being handed down, the Legislature, the Attorney General, local law enforcement agencies, and citizens across the state are demanding an end to Montana's "culture" and "deadly tradition" of alcohol abuse and drunk driving. Indeed, hardly a week goes by without a citizen, a public official, or one of the state's largest newspapers calling for solutions: tougher sentences, increased regulation of those who furnish the alcohol, more training—anything to put an end to the DUI nightmare.[4] In this regard, an interim legislative committee has

---

[4] *See e.g.* Michael Jamison, *Culture under the Influence*, Helena Independent Record (May 31, 2009); Editorial, *Fight Alcohol Abuse: How You Can Help Prevent More Deaths from Drunken Driving*, Missoulian (June 14, 2009); Editorial, *DUI Sentences Vary Too Widely*, Missoulian (June 22, 2009); Editorial, *Interlock Devices a No-Brainer*, Missoulian (June 29, 2009); Editorial, *Toughen Up Drunken-Driving Laws*, Helena Independent Record (July 12, 2009); Hon. Steve Bullock, Editorial, *Montanans More Than Ready to Support Effective DUI Laws*, Helena Independent Record (July 19, 2009); Tawny Haynes, Editorial, *Stopping Future Tragedies with Prevention and Enforcement*, Helena Independent Record (July 20, 2009); Editorial, *Alcohol-Free Zone a Strong Message*, Helena Independent Record (July 21, 2009); Editorial, *Montana Must Get Intoxicated Drivers off Road*, Billings Gazette (July 23, 2009); Angela Brandt, *Helena Police Remind Public about Consequences of Driving Drunk*, Helena Independent Record (Aug. 20, 2009); Editorial, *Put Brakes on Climbing DUI Death Toll*, Billings Gazette (Oct. 7, 2009); Michael Jamison, *Flathead Boat Crash: Drinking and Driving Entrenched as a Deadly Montana Tradition*, Missoulian (Oct. 19, 2009); Editorial, *Montana Needs Alcohol Culture Change*, Missoulian (Oct. 26, 2009); Editorial, *Time to Change Drinking Tradition*, Helena Independent Record (Oct. 28, 2009); Editorial, *Training Can Combat Drunken Driving*, Missoulian (Nov. 8, 2009); Charles S. Johnson, *Alcohol Sales Penalty Proposal Contested*, Helena Independent Record (Nov. 19, 2009); Editorial, *Don't Weaken Illegal Alcohol Sales Penalties*, Helena Independent Record (Nov. 24, 2009); Editorial, *Teach Teens to Avoid Alcohol Culture*, Missoulian (Nov. 29, 2009); Editorial, *Legislature Should Help Put Brakes on DUIs*, Billings Gazette

been formed to study the problem and to identify strengths and weaknesses in Montana's laws and "possible alternative penalty and enforcement provisions" that might reduce the incidence of repeat offenses.[5] *See* Laws of Montana, 2009, Senate Joint Resolution No. 39. Seemingly, everyone wants to put an end to the "culture" and to the carnage on our highways.[6]

¶52 This case, however, illustrates why these efforts will most surely fail. And the reason is simple: No one wants to accept responsibility for the problem. Those who are doing the drinking believe they can handle themselves perfectly fine after a few belts at the local watering hole. And they certainly cannot accept the notion of the government

---

(Dec. 1, 2009); Editorial, *Changing Minds – and Laws: Legislators Give their Responses on Ways to Stop Drunken Driving, Sales to Minors*, Missoulian (Dec. 6, 7, and 8, 2009); Kris Minard, Editorial, *Time to Stop Tolerating Driving Drunk*, Helena Independent Record (Dec. 15, 2009); Editorial, *Sobering Statistics for Montana's Holiday Travelers*, Billings Gazette (Dec. 17, 2009); Lorna Thackeray, *DUI Task Force Honors High Driver's Victim*, Billings Gazette (Dec. 17, 2009); Jennifer McKee, *Lawmakers Mull Options on DUI Crackdown*, Helena Independent Record (Dec. 18, 2009); Editorial, *Progress Being Made on DUI Laws*, Helena Independent Record (Dec. 23, 2009).

[5] A report was provided to the committee in July 2009. *See SJR 39: A Primer* (available at http://leg.mt.gov/content/Committees/Interim/2009_2010/Law_and_Justice/ Staff_Reports/SJR%2039%20PRIMER.pdf). According to the report, Montana has the dubious distinction of ranking highest in the nation for alcohol-related traffic fatalities. *See SJR 39: A Primer*, at 3. The report lists numerous suggested solutions from various agencies and organizations. Notably, two such proposals are "limitations on happy hours and other alcohol sales practices that promote drinking" and "mandatory training for those who serve alcoholic beverages." *See SJR 39: A Primer*, at 8 (citing the website of Mothers Against Drunk Driving).

[6] Remarkably, there were 4.5 times as many alcohol-related traffic fatalities (103) than there were homicides (23) in 2008. The numbers were even worse in 2007 (124 alcohol-related traffic fatalities versus 14 homicides). *See Montana Crime Rates 1960-2008*, http://www.disastercenter.com/crime/mtcrimn.htm (accessed Dec. 23, 2009); *Montana Drunk Driving Statistics*, http://www.alcoholalert.com/drunk-driving-statistics-montana.html (accessed Dec. 23, 2009). This year, alcohol has been a factor in 83 traffic deaths—one alcohol-related death every four days. *See* Editorial, *Sobering Statistics for Montana's Holiday Travelers*, Billings Gazette (Dec. 17, 2009).

24

telling them how much they are allowed to drink. It's part of being a Montanan. On the other side, the tavern owners say the problem is not theirs—understandably, they are in the business of selling booze, and the more sold, the higher the profits. Event sponsors (including the Montana Chamber of Commerce, the Helena Chamber of Commerce, the Montana University System, and Downtown Helena, Inc.) say the problem is not theirs—after all, alcoholic beverages are a "staple" at many events, and with so many people it's just too difficult to make sure that alcohol is not being served to those who are underage or visibly intoxicated. So too with many social hosts, who do not believe it is their responsibility to police their guests and stop those who drink to excess from driving. In short, when it comes to Montana's culture of alcohol abuse and drunk driving and the carnage on its highways, those who furnish the alcohol are quick to point the finger at anyone but themselves.

¶53    Indeed, every purveyor of alcohol wants, and usually gets, its own little "get out of jail free" card. For instance, the tavern industry is practically falling over itself in support of the Department of Revenue's proposal to weaken penalties for bars, casinos, and stores that illegally sell alcohol to minors, if they voluntarily train their employees in a course on responsible alcohol sales and service. *See* Charles S. Johnson, *Alcohol Sales Penalty Proposal Contested*, Helena Independent Record (Nov. 19, 2009). Yet, as Tawny Haynes (widow of a Highway Patrol officer killed by a drunk driver earlier this year) pointed out during DOR's public hearing, "Our bartenders and servers are the first line of defense against drunken driving. . . . I'd like to know when handing out a free pass and giving someone less accountability has ever encouraged them to be more responsible."

25

*See* Johnson, Helena Independent Record 11A.   Likewise, the *Independent Record* recently argued that "employee training should be a mandatory condition of all liquor license holders, not a means to dodge responsibility."  Editorial, *Don't Weaken Illegal Alcohol Sales Penalties*, Helena Independent Record 4A (Nov. 24, 2009).   But that is what this case is all about:  forcing victims to pay the costs for the irresponsibility and unlawful conduct of others through special laws designed to benefit a discrete group of offenders.

¶54     The law at issue here is a particularly offensive example of this.  It arbitrarily bars relief for some victims and allows offenders to avoid responsibility without regard to the law's purpose—which, as noted, is to aid an alcohol purveyor in gathering and preserving evidence concerning an injury-producing incident of which he is otherwise unaware.  If the defendant does not, within 180 days of serving the alcohol, receive notice by certified mail that the plaintiff intends to sue, then he is entitled to dismissal of the case.  This is so whether or not the defendant actually knew within that timeframe that he was going to be sued, whether or not the defendant has prepared a defense despite the plaintiff's failure to mail the required notice, and whether or not witnesses could still be interviewed and evidence could still be obtained.  Indeed, dismissal is required even if the victim had no way of determining the tavern's identity within 180 days—where, for example, the drunk driver was in a coma, or perhaps had fled the scene, and there was no way of ascertaining where he or she was drinking on the night in question.  Dismissal is also required without regard to the realities faced by the victims of drunk drivers, who often are seriously injured and must undergo treatment or rehabilitation.  Such victims might not know the

26

extent of their injuries during the 180-day period; but even if they do, their focus is on getting healed, not on throwing the doctors out of the hospital room so that they can find a lawyer to file a lawsuit. Likewise, if the victim dies, the family may be in shock and simply trying to put their lives back together during the 180 days following the death. In point of fact, and contrary to the tavern industry's view of suit-happy plaintiffs chomping at the bit, the victims of drunk drivers more than likely have neither the time nor the inclination to consider their legal options during the six months following the accident. They need the three years that other tort plaintiffs have to conduct a proper investigation, explore legal action, hire counsel, and commence litigation. Yet, these victims, because of their basic need to recover from trauma, consider their options, and then act, are denied the opportunity to hold the negligent or (as here) willful alcohol purveyor accountable. The 180-day special legislation curtails this process and hands the irresponsible alcohol purveyor the ultimate "get out of jail free" card: immunity from suit.

## II. ANALYTICAL APPROACH

¶55    In analyzing the constitutional questions presented in this case, it is necessary first to supplement the Court's wholly insufficient, six-sentence recitation of the factual circumstances in which the Rohlfs' constitutional challenge arises. *Cf. Brady v. PPL Montana, LLC*, 2008 MT 177, ¶ 5, 343 Mont. 405, 185 P.3d 330 (refusing to address constitutional issues "in a relative vacuum"). I do so in Section III below.

¶56    Next, the legislative history of the 180-day notice provision is likewise far more involved than the Court's brief discussion at ¶¶ 15-17 reflects. Moreover, in this regard, the Court is flat incorrect in stating at ¶ 19 that a cause of action against a purveyor of

27

alcoholic beverages is a "statutory claim." It is not. It is a common law negligence action and has been since long before the Legislature got involved. True, the Legislature has imposed certain limits on this cause of action. But the Legislature did not create it, as the Court erroneously suggests. For these reasons, in Section IV, I explain the evolution of so-called "dram-shop liability" in this state and the tavern industry's successful efforts in getting the Legislature to reverse the progression of the law in this area.

¶57 Lastly, in its constitutional analysis the Court confuses the class at issue here. Thus, in Section V, I identify the correct class and explain why the 180-day notice provision is special legislation.

## III. FACTUAL BACKGROUND

¶58 Joseph Warren began drinking at the Stumble Inn in Victor at about 2:00 p.m. on June 29, 2006. Eleven hours later, at around 1:00 a.m. on June 30, Warren left the Stumble Inn, got into his car, and sped out of the Stumble Inn's parking lot on his way to another bar a short distance away. Without ever touching his brakes, Warren slammed into Cary Rohlfs, who was traveling northbound on U.S. Highway 93, within the speed limit, on his way to work. According to one witness, Warren was "spinning out across the parking lot" and "drove right into that other car." Another witness stated that Warren entered the highway from the parking lot at a high rate of speed, never slowing or yielding to the highway traffic. As noted, Cary suffered serious injuries in the crash.

¶59 Sergeant Steve Holton of the Ravalli County Sheriff's Office responded to the scene. He noted that Warren smelled so strongly of alcohol that he could detect the odor on Warren from eight to ten feet away. Holton also noted that Warren's speech seemed

28

impaired during his interactions with emergency medical services and fire department personnel. Lisa Foley (a Stumble Inn bartender) told Holton that Warren had "about a beer an hour" throughout her shift, which began at 6:00 p.m., and then had "a shot for a nightcap" as she was closing the bar at around 1:00 a.m. She said she had encouraged Warren to call for a ride or get a taxi, but he refused. Likewise, Bobbie Smith (one of the witnesses to the crash) reported that she thought Warren was intoxicated. Smith stated that she had seen Warren drink two beers and one shot before leaving the bar. Another witness, Jerry Craft, stated that Warren was "obviously too drunk to drive." Yet another witness, Mark Metcalf, reported that he thought Warren was under the influence of alcohol and that four or five people (besides Foley) had told Warren not to drive, fearing he was too intoxicated.

¶60    Montana Highway Patrol Officer Lath Keith examined the scene of the crash. He observed 157 feet of tire marks leading from the Stumble Inn to the place where Warren's vehicle was resting. The tire marks were consistent with acceleration the entire length and showed no signs of braking or turning. Keith then interviewed Warren at the hospital. When asked to explain what had happened, Warren stated: "I don't remember a damn thing." Keith detected a very strong odor of alcohol on Warren's breath, and he observed that Warren's eyes were bloodshot and glassy and his speech seemed slurred. Warren said that he had been at the Stumble Inn since about 2:00 p.m., and he estimated that "I've probably had about four [MGD draft] beers and probably had about three shots of Black Velvet." Warren noted that he had "chugged" his last half beer about 20

29

minutes before leaving the bar. He agreed to provide a blood sample, which was drawn at 3:30 a.m. (2.5 hours after the accident) and revealed a blood alcohol level of 0.14.

¶61 Keith subsequently conducted follow-up interviews with several of the witnesses. Metcalf stated that when he arrived at the Stumble Inn that evening at around 9:00 p.m., it was already apparent to him that Warren had been drinking. While he was there, Metcalf observed Warren drinking beer at the bar, and he stated that Warren "got progressively drunker as the evening went on." Metcalf noted that the bartender had "tried to slow his drinking down" and had even refused to serve Warren at one point. Metcalf said that at the time Warren left the bar, he was "unable to control what he was doing," was "a little bit belligerent," and was "obviously too drunk to drive."

¶62 Foley reported that Warren is "a usual at our bar"; in fact, "he's usually there most of the time." Foley confirmed that Warren's "usual routine" is to drink "about a beer an hour" plus a shot of liquor "before he leaves." Foley added that after the accident, she observed Warren "on the ground kind of just, um, didn't really know where he was kind of thing." Similarly, Smith told Keith that Warren "usually drinks about a beer per hour and then before he goes home, he usually has one or two shots at the very end of the night." She noted that after the crash, Warren "just kind of fell out of the car."

¶63 Warren ultimately pleaded guilty to negligent vehicular assault pursuant to a plea bargain under which the State agreed to dismiss charges of driving under the influence and criminal endangerment. He is serving a five-year sentence at Montana State Prison.

¶64 Thus, in sum, the record reflects that Warren, a regular patron at the Stumble Inn, was there for eleven hours on the day in question. He drank beer throughout this period

30

and also had three shots of Black Velvet. He was visibly intoxicated at 9:00 p.m. and got "progressively drunker" as the evening went on. Nevertheless, Stumble Inn continued to serve Warren all the way up to the final minutes before the accident. Indeed, he chugged his last half beer 20 minutes before leaving the bar, and he had a shot for a nightcap— "one more for the road," as they say—as the bartender was closing the bar. Warren then got into his car, although he was "obviously" too drunk to drive, and a quick 157 feet of burnt rubber later, he smashed into Cary Rohlfs, causing Cary serious injuries.

¶65    Yet, despite this misconduct, Stumble Inn now brazenly attempts to portray *itself* and the tavern industry generally as the victims here—victims of unjust lawsuits sprung on unsuspecting defendants by suit-happy plaintiffs, and against which these defendants have no ability defend themselves absent the protection of the 180-day notice provision. There is no evidence in the record, however, that Stumble Inn is unable to mount a defense to the Rohlfs' claims. Rather, Stumble Inn is simply invoking a special law skillfully crafted by the tavern industry and readily enacted by the Legislature to force the Rohlfs to pay the costs of Stumble Inn's irresponsibility and gross negligence.

## IV. BACKGROUND OF THE NOTICE PROVISION

¶66    To fully understand the circumstances under which the 180-day notice provision was enacted in 2003, it is necessary to start 70 years earlier. Coinciding with the repeal of Prohibition, *see* U.S. Const. amend. XXI (ratified Dec. 5, 1933), the Legislature passed the State Liquor Control Act of Montana (Laws of Montana, 1933, ch. 105) and the Montana Beer Act (Laws of Montana, 1933, ch. 106), the stated purpose of which was to control and regulate the sale of alcoholic beverages within this state. *See* Laws of

31

Montana, 1933, ch. 105, § 102. Five years later, the voters approved the Montana Retail Liquor License Act (Laws of Montana, 1937, ch. 84; *see* Laws of Montana, 1939, at 731-42), which imposed additional restrictions on the sale and distribution of alcoholic beverages "for the protection, health, welfare and safety of the people of the state." Laws of Montana, 1937, ch. 84, preamble (codified at § 4-401, RCM (1947)). Of relevance here, these three acts barred the provision of alcoholic beverages to a person who is actually, apparently, or obviously intoxicated.[7]

¶67 This Court addressed the issue of liability to a third party under these statutes in *Nevin v. Carlasco*, 139 Mont. 512, 365 P.2d 637 (1961). The plaintiff/appellant (Helen Nevin) was injured in the Ledo Bar on June 7, 1953, under the following circumstances:

> The record . . . discloses that one Wilbur Workman was seated at the east end of the bar and that to his left was a girl by the name of Sandra, a presumed companion of Workman. There was no evidence adduced showing that the respondents had served Wilbur Workman any intoxicating liquor though the record does disclose that he had a glass partially filled with an amber fluid and ice in front of him; that he was creating no

---

[7] *See e.g.* Laws of Montana, 1933, ch. 105, § 55 (codified at § 4-160, RCM) ("No vendor, beer licensee, or club licensee, nor any employee of a vendor, beer licensee, or club licensee, shall sell any liquor, or permit any liquor to be sold, to any person apparently under the influence of liquor."); Laws of Montana, 1933, ch. 105, § 62 (codified at § 4-167, RCM) ("No person shall . . . [g]ive any liquor to any person apparently under the influence of liquor." (paragraph breaks omitted)); Laws of Montana, 1933, ch. 106, § 31, *amended*, Laws of Montana, 1933-34, Extraordinary Session, ch. 46, § 11 (codified at § 4-330, RCM) ("It shall be unlawful . . . for any person, firm or corporation to sell or dispose of beer to any person who shall appear to be in an intoxicated or disorderly condition . . . ."); Laws of Montana, 1937, ch. 84, § 11, *amended*, Laws of Montana, 1939, ch. 221, § 3 (codified at § 4-413, RCM) ("No licensee or his or her employee or employees shall sell, deliver or give away or cause or permit to be sold, delivered or given away any liquor, beer or wine to . . . [a]ny intoxicated person or any person actually, apparently or obviously intoxicated." (paragraph breaks omitted)). It is still unlawful to give an alcoholic beverage to "any person actually, apparently, or obviously intoxicated." Section 16-3-301(4), MCA (2009); *see also* § 16-6-304, MCA.

32

disturbance and neither was he noisy nor boisterous. It further appears that Workman[,] motivated by the irresistible call of affection, endeavored to commence osculatory exercises with Sandra. She being the eternal female at the moment decided she did not want to be kissed and shoved Workman, who in turn fell off the bar stool and injured [Nevin], by knocking her to the floor and injuring her right ankle. [Nevin] testified that she did not notice Workman, that she made no complaint about him to anyone, and that she did not see anyone serve Workman a drink of anything.

*Nevin*, 139 Mont. at 513, 365 P.2d at 637-38.

¶68    Nevin filed suit against the bar owners to recover damages for her injuries. The district court, however, granted a judgment of nonsuit on behalf of the defendants on the grounds that the complaint failed to state a cause of action, that Nevin had failed to produce competent evidence to prove a cause of action, and that there was insufficient evidence to justify the case going to the jury. *Nevin*, 139 Mont. at 513-14, 365 P.2d at 638. On appeal, Nevin argued (among other theories) that the bar owners had violated certain laws dealing with the liquor business—in particular, §§ 4-167 and 4-159, RCM (1947). Section 4-167, RCM, provided that no person shall (a) permit drunkenness to take place in any house or on any premises of which he is owner, tenant, or occupant, (b) permit any person apparently under the influence of liquor to consume any liquor in any house or on any premises of which the first-named person is owner, tenant, or occupant, or (c) give any liquor to any person apparently under the influence of liquor. Section 4-159, RCM, provided, in pertinent part, that no person shall be in an intoxicated condition in a public place.

¶69    As noted, there was no evidence in the record that Workman had been "apparently under the influence of liquor" while he was at the bar or that the bar owners had served

33

him any intoxicating liquor. All the record disclosed was that he had a glass partially filled with an amber fluid and ice in front of him, that he was not creating a disturbance, and that he was neither noisy nor boisterous. This state of the evidence was sufficient to dispose of Nevin's claim under the foregoing statutes. Nevertheless, the *Nevin* Court proceeded gratuitously to offer the view that "when damages arise from voluntary intoxication, the seller of the intoxicant is not liable in tort for the reason that his act is not the efficient cause of the damage. The proximate cause is the act of him who imbibes the liquor." *Nevin*, 139 Mont. at 515-16, 365 P.2d at 639.

¶70    Thus emerged in this Court's jurisprudence the dubious proposition that a person who sells or gives an alcoholic beverage to an underage or apparently intoxicated person, in violation of Montana law, is not the legal cause of injuries suffered by a third person as a result of the consumer's intoxication. Notably, the *Nevin* Court provided no analysis, and cited not a single shred of authority, in support of this rule. In any event, the Court went on to hold that Nevin "was obliged to prove a set of circumstances which created a duty to the injured patron and facts that would prove a breach of that duty. Having failed to do so the judgment of the district court was correct and it is hereby affirmed." *Nevin*, 139 Mont. at 516, 365 P.2d at 639 (citation omitted). The *Nevin* Court thus left open the slim possibility that there could be liability under a different "set of circumstances."

¶71    In this regard, it is noteworthy that during this same period, various courts in other jurisdictions were reevaluating the common law rule that the vendor of intoxicating liquor cannot be held liable for furnishing alcoholic beverages to a customer who in turn injures a third person. A substantial number of these courts concluded that the sale of

34

alcoholic beverages may be the proximate cause of such injuries and that liability may be imposed upon the vendor in favor of the injured third person. *See Vesely v. Sager*, 486 P.2d 151, 157 (Cal. 1971) (citing cases). In one of the leading cases, the court reasoned that

> [w]hen alcoholic beverages are sold by a tavern keeper to a minor or to an intoxicated person, the unreasonable risk of harm not only to the minor or the intoxicated person but also to members of the traveling public may readily be recognized and foreseen; this is particularly evident in current times when traveling by car to and from the tavern is so commonplace and accidents resulting from drinking are so frequent. If the patron is a minor or is intoxicated when served, the tavern keeper's sale to him is unlawful; and if the circumstances are such that the tavern keeper knows or should know that the patron is a minor or is intoxicated, his service to him may also constitute common law negligence.

*Rappaport v. Nichols*, 156 A.2d 1, 8-9 (N.J. 1959) (citations omitted); *see also Waynick v. Chicago's Last Dept. Store*, 269 F.2d 322 (7th Cir. 1959); *Elder v. Fisher*, 217 N.E.2d 847 (Ind. 1966).

¶72 Similarly, another court reasoned that while early cases understandably did not recognize any duty of a vendor of intoxicating beverages to the traveling public because a serious hazard did not then exist, "[t]oday, the hazards of travel by automobiles on modern highways has become a national problem" and "[t]he drunken driver is a threat to the safety of many." *Berkeley v. Park*, 262 N.Y.S.2d 290, 293 (Sup. Ct. 1965). The court concluded that " '[p]recedents drawn from the days of travel by stagecoach do not fit the conditions of travel to-day' " and that "modern conditions dictate the adaptation of the common law." *Berkeley*, 262 N.Y.S.2d at 293 (quoting *MacPherson v. Buick Motor Co.*, 111 N.E. 1050, 1053 (N.Y. 1916)). To that end, the court rejected the "simply

35

unreal" rule that the selling of alcohol cannot be a proximate cause of subsequent injuries. *See Berkeley*, 262 N.Y.S.2d at 293-94.

¶73 Another significant decision for purposes of the present discussion is *Deeds v. United States*, 306 F. Supp. 348 (D. Mont. 1969). In *Deeds*, Air Force personnel sold or otherwise dispensed intoxicating liquor to Gerald Tanberg (a 19-year-old airman) during a party at the Non-Commissioned Officers Club at the Havre Air Force Station (located 39 miles north of Havre, Montana) on May 30 and 31, 1963. The individuals dispensing the liquor knew that Tanberg was drinking to excess, but they continued to serve him nonetheless. Later, between 2:00 and 3:00 a.m., Tanberg agreed to give Gerald Freeland (another 19-year-old airman) and Sandra Deeds (a 17-year-old high school junior) a ride to Havre in Tanberg's car. During the trip, Tanberg drove in a grossly negligent and reckless manner; and while traveling at an excessive rate of speed, his car left the road and rolled over, wrecking the car and injuring the three occupants. *See Deeds*, 306 F. Supp. at 349-50, 353-54.

¶74 Deeds thereafter sought damages for her injuries. At the outset of its analysis, the court noted that in serving liquor to Tanberg, the Air Force personnel flagrantly violated § 4-413, RCM (prohibiting the provision of liquor, beer, or wine to "any person actually, apparently or obviously intoxicated"). *Deeds*, 306 F. Supp. at 354. The court then turned to the question of whether there is "a right of action under Montana law against the person selling or furnishing intoxicating liquor to a minor or intoxicated person in favor of a person injured by the intoxicated person as a consequence of his intoxication." *Deeds*, 306 F. Supp. at 354. Concluding that this Court had not decided this question in

36

*Nevin*, *see Deeds*, 306 F. Supp. at 354, 360, the court analyzed numerous cases from other jurisdictions and found that the trend in recent cases was to permit recovery where a statute made it illegal to sell or dispense liquor to minors and intoxicated persons, *Deeds*, 306 F. Supp. at 354-58. The court observed that Montana had such a statute (§ 4-413, RCM) and that this statute and others regulating the provision of intoxicating beverages were enacted " 'for the protection, health, welfare and safety of the people of the state.' " *Deeds*, 306 F. Supp. at 358-59 (quoting § 4-401, RCM). Finally, the court considered the question of proximate cause. As an initial matter, the court rejected the defendant's argument that Montana should follow the rule of *Fleckner v. Dionne*, 210 P.2d 530 (Cal. App. 1st Dist. 1949) (the proximate cause of injury is the patron's voluntary consumption of liquor, not the defendant's illegal sale of it). The court observed that this rule was a " 'back-eddy running counter to the mainstream of modern tort doctrine.' " *Deeds*, 306 F. Supp. at 359 (quoting *Fuller v. Standard Stations, Inc.*, 58 Cal. Rptr. 792, 794 (Cal. App. 3d Dist. 1967)). The court pointed out that the rule of proximate cause in Montana simply requires that the injurious consequence be attributable to the original negligence as a result which might reasonably have been foreseen as probable; i.e., it is sufficient if the facts and circumstances are such that the consequence is within the field of reasonable anticipation. *Deeds*, 306 F. Supp. at 361 (citing *Reino v. Montana Mineral Land Dev. Co.*, 38 Mont. 291, 99 P. 853 (1909), and *Mize v. Rocky Mt. Bell Tel. Co.*, 38 Mont. 521, 100 P. 971 (1909)).

¶75 Applying these rules, the court held that the Air Force personnel "who sold and served the liquor to an intoxicated minor, knowing that it would be necessary for the

37

airmen at the party to return their dates to Havre by private automobile, could reasonably foresee or anticipate some accident or injury as a reasonable and natural consequence of their illegal and negligent acts." *Deeds*, 306 F. Supp. at 361. The court noted that this was particularly true "in view of the ever increasing incidence of serious automobile accidents resulting from drunken driving." *Deeds*, 306 F. Supp. at 361. Thus, in seeming contradiction to the view stated in *Nevin*, the *Deeds* court held that "the sale and serving of liquor to Tanberg in violation of Montana law was a proximate cause of the accident and resulting injuries to plaintiff." *Deeds*, 306 F. Supp. at 361.

¶76 This Court acknowledged the holding of *Deeds* in *Runge v. Watts*, 180 Mont. 91, 589 P.2d 145 (1979), where the defendant (a social host) served alcohol to Watts (a minor) and Watts' intoxication later resulted in a car accident causing Runge's injury. The *Runge* Court decided, however, that *Deeds* was not controlling, explaining that

> [t]raditionally, there has been greater justification for imposing liability on a commercial purveyor than on a social purveyor. There is a greater need for some check on the pecuniary motives of those engaged in the business of selling alcoholic beverages. In addition a commercial vendor is in a better position to observe his customers and monitor their level of intoxication by virtue of the fact that the seller is more likely to communicate with the patron each time he serves a new drink.

*Runge*, 180 Mont. at 94, 589 P.2d at 147. The Court acknowledged "the high incidence of automobile accidents attributable to intoxication" and the fact that "innocent third parties stand to suffer substantial harm in such situations." *Runge*, 180 Mont. at 94, 589 P.2d at 147. Nevertheless, the Court reaffirmed the rule stated in *Nevin* and held that "Watts' drinking and not defendant's serving the beer was the proximate cause of the accident." *Runge*, 180 Mont. at 94, 589 P.2d at 147. At the same time, however, and in

38

seeming contradiction to this holding, the Court noted (in more gratuitous dicta) that a cause of action could be brought against a furnisher of alcohol if the person to whom the liquor was sold or given was " 'in such a state of helplessness . . . as to be deprived of his willpower or responsibility for his behavior.' " *Runge*, 180 Mont. at 93, 589 P.2d at 146-47 (ellipsis in *Runge*) (quoting 45 Am. Jur. 2d *Intoxicating Liquors* § 554).

¶77    Such was the state of the law through 1985. Purveyors of alcoholic beverages enjoyed a special immunity in Montana state courts thanks to a judicially-created exception to the well-established rules governing foreseeability and proximate cause. Our courts insulated these persons and entities from liability for their negligent conduct by holding (without reasoned explanation) that a person's act of consuming an alcoholic beverage, not the purveyor's act of furnishing the beverage, is the sole proximate cause of any resulting injuries to the imbiber or to a third party. *Nevin*, 139 Mont. at 515-16, 365 P.2d at 639; *Runge*, 180 Mont. at 94, 589 P.2d at 147; *Folda v. City of Bozeman*, 177 Mont. 537, 582 P.2d 767 (1978); *Swartzenberger v. Billings Labor Temple Assn.*, 179 Mont. 145, 586 P.2d 712 (1978). This approach was flawed for the reasons set out in the well-researched *Deeds* opinion—a fact we finally recognized in *Nehring v. LaCounte*, 219 Mont. 462, 712 P.2d 1329 (1986), decided January 21, 1986.[8]

¶78    The pertinent facts of *Nehring* are as follows. Between 2:00 and 9:00 p.m. on September 19, 1980, Michael Bottensek consumed four beers and smoked a joint of marijuana. He, his brother, Patty Thoring, and Jolene McGillis then departed for Lenny's

---

[8] Notably, by this point in time, a majority of jurisdictions had some form of dram-shop liability, whether by statute or through judicial changes to the common law. *See Largo Corp. v. Crespin*, 727 P.2d 1098, 1101 (Colo. 1986), and sources cited therein.

Bar in Bainville, Montana (about 35 miles from their homes in Williston, North Dakota). On the way, Bottensek drank two more beers. They arrived at about 10:00 p.m., and Bottensek then consumed roughly eight more beers during the next two or three hours. He was drunk when he ordered his last beer and his speech was slurred. By closing time, Thoring, McGillis, and Bottensek's brother were also drunk. Just before leaving, Thoring and McGillis bought a fifth of lime vodka and a case of Budweiser beer. About an hour later, while on their way home, Bottensek drove the wrong way on a four-lane divided highway and struck head-on an oncoming vehicle driven by Harold Nehring. Nehring was killed, as were Thoring and McGillis. At the time of the accident, Bottensek's blood alcohol level was 0.20. *See Nehring*, 219 Mont. at 464-65, 712 P.2d at 1331.

¶79    On appeal, we vacated the district court's grant of summary judgment in favor of the LaCountes (the owners and operators of Lenny's Bar). Employing an analysis similar to that of the *Deeds* court, we first observed that it is unlawful to sell or give an alcoholic beverage to any person actually, apparently, or obviously intoxicated. *Nehring*, 219 Mont. at 467, 712 P.2d at 1333 (citing §§ 16-3-301(2) and 16-6-304, MCA (1979)). We next observed that the stated purpose of these statutes is the protection of the welfare, health, peace, morals, and safety of the people of the state. *Nehring*, 219 Mont. at 468, 712 P.2d at 1333 (citing §§ 16-1-101 and -103, MCA). We concluded, however, that the statutes were intended to protect the people of the state generally, rather than to protect against any particular kind of injury or provide a civil remedy. Thus, we held that a violation of the statutes is not negligence per se; rather, it may be relevant in determining

whether a defendant's conduct was negligent. *Nehring*, 219 Mont. at 468, 712 P.2d at

1333. In reaching this conclusion, we explained that

> [a]n unreasonable risk of harm is more likely under present day conditions
> than in the past, when the common law bar to recovery was a majority
> position. ". . . [T]his is particularly evident in current times when traveling
> by car to and from the tavern is so commonplace and accidents resulting
> from drinking are so frequent." *Rappaport*, 156 A.2d at 8-9, cited in
> *Deeds*, 306 F.Supp. 348, 355. Current conditions in Montana are such that
> the literal application of the common law rule has become unjust. "When
> the reasons of a rule ceases, so should the rule itself." Section 1-3-201,
> MCA. Therefore we judicially adopt the alcoholic beverage control statutes
> as furnishing a standard against which negligence or due care can be
> measured. Accordingly, a violation thereof is evidence of negligence.

*Nehring*, 219 Mont. at 469, 712 P.2d at 1334 (ellipsis and second brackets in *Nehring*).

¶80     Turning to the question of causation, we acknowledged the rule stated in *Nevin*

and reaffirmed in *Runge* that the drinking of the intoxicating beverage, not the furnishing

thereof, is the proximate cause of any subsequent injury. We rejected this rule, however,

as a "Neanderthal approach" to causation, since it exempts the purveyor of alcoholic

beverages from liability without regard to his own negligence or fault. *Nehring*, 219

Mont. at 471, 712 P.2d at 1335. Rather than perpetuate this special, yet totally baseless

exemption for alcohol purveyors, we instead simply followed our longstanding approach

to proximate cause in negligence cases:

> "It is sufficient if the facts and circumstances are such that the
> consequences attributable to the wrongful conduct charged are within the
> field of reasonable anticipation; that such consequences might be the
> natural and probable results thereof, though they may not have been
> specifically contemplated or anticipated by the person so causing them."

*Nehring*, 219 Mont. at 470, 712 P.2d at 1334 (quoting *Reino v. Montana Mineral Land*

*Dev. Co.*, 38 Mont. 291, 296, 99 P. 853, 854-55 (1909)). Applying this rule, we held that

41

"consumption of the alcoholic beverages served, subsequent driving, and the likelihood of an injury-producing accident are foreseeable intervening acts which do not relieve the tavern operator of liability for negligence." *Nehring*, 219 Mont. at 470, 712 P.2d at 1335. We then remanded the case for further proceedings, given that genuine issues of material fact remained. *Nehring*, 219 Mont. at 472, 712 P.2d at 1336.

¶81 After *Nehring* was handed down, much misinformation was publicly disseminated about the decision through "[i]nadequate reporting, poorly informed editorial comments, and propaganda dispensed by lobbyists for the Montana Tavern Association." *See Bissett v. DMI, Inc.*, 220 Mont. 153, 158, 717 P.2d 545, 548 (1986) (Morrison & Harrison, JJ., specially concurring and dissenting). To be sure, *Nehring* effected a change in the law in that Montana finally joined the numerous jurisdictions that had already recognized dram-shop liability during the preceding three decades. Yet, it had always been the case, under longstanding principles of common law negligence, that one who acts negligently and causes injury to another is liable for that harm. In *Nehring*, we simply jettisoned the Neanderthal proposition that a purveyor of alcoholic beverages cannot be a proximate cause of an injury-producing accident. This, of course, had been a special exemption in negligence law heretofore enjoyed exclusively by alcohol purveyors, which had left them free to dispense their product without regard for the consequences to third parties. In any event, *Nehring* did not transfer accountability from the intoxicated person to the entity that served him. The drunk driver remained liable for the victim's injuries. But the tavern was also made accountable for its share of responsibility in causing the injury-

42

producing accident. In short, *Nehring* simply held that purveyors of alcoholic beverages are subject to the same negligence principles as everyone else.

¶82 Such equality, however, was evidently intolerable; and the tavern industry, having lost its judicially-created immunity from suit, immediately sought legislatively-created immunity from suit. The Legislature, in turn, passed House Bill 13 (HB 13) during a six-day special session in March 1986. *See* Laws of Montana, 1987, Special Session March 1986, ch. 1 (effective Apr. 4, 1986) (codified at § 27-1-710, MCA). HB 13 resurrected the "Neanderthal" rule of *Nevin* by providing that "[f]urnishing a person with an alcoholic beverage is not a cause of, or grounds for finding the furnishing person or entity liable for, injury or damage wholly or partly arising from an event involving the person who consumed the beverage." *See* § 27-1-710(3), MCA (1987). HB 13 also recognized three exceptions to this rule where (a) the consumer was under the legal drinking age and the furnishing person knew that the consumer was underage or did not make a reasonable attempt to determine the consumer's age, (b) the consumer was visibly intoxicated, or (c) the furnishing person forced or coerced the consumption or told the consumer that the beverage contained no alcohol. But aside from these three situations, the tavern industry again had its special exemption from the traditional rules of proximate cause.

¶83 Numerous organizations and individuals (primarily tavern owners) testified in favor of HB 13. No one spoke against it. Senator J.D. Lynch (a co-sponsor) explained that the bill addressed what he characterized as a "ridiculous" ruling of this Court. Senator Lynch pointed to newspaper editorials which apparently construed *Nehring* as allowing the farmer who sold the barley to be held liable for a drunk-driving accident.

43

Representative Dave Brown (the chief sponsor) argued that the bill "places the responsibility for one's actions back on the individual where it belongs and from where the Supreme Court chose to take it." Several other proponents echoed this sentiment—though, as noted, it is a complete misstatement of our holding in *Nehring*. Other proponents argued that HB 13 was vitally important to lowering the cost of insurance. Phil Strope with the Montana Tavern Association stated that liquor liability insurance was impossible to obtain or too costly to afford. The Montana Beer and Wine Wholesalers Association lamented the fact that coverage was becoming unavailable and causing organizations that host softball tournaments, rodeos, and similar events to cancel plans for beer stands and the like. Representative Bob Pavlovich (another co-sponsor) similarly argued that 1,500 taverns were facing the loss of liability insurance and if they didn't get some relief, "the main streets of Montana [are] going to be pretty dark." Representative Paul Pistoria stated that 10,000 people in the state were employed in the alcohol industry and that "[s]omething has to be done for these people, and this is our opportunity to help them." In this regard, while great concern was expressed for the tavern industry throughout the committee hearings, notably absent was any discussion of society's interest in preventing alcohol-related injuries and fatalities and victims' interest in obtaining a just remedy. Nor was any concern expressed about Montana's culture of alcohol abuse and the carnage on its highways caused by drunk drivers.

¶84　In 1989, the Legislature amended § 16-6-305, MCA, to clarify that parents may provide moderate amounts of alcohol to their children but may not get them drunk. *See* Laws of Montana, 1989, ch. 448. In conjunction with this, a cross-reference to

44

§ 16-6-305, MCA, was added to § 27-1-710, MCA. But aside from this, § 27-1-710, MCA, remained unchanged until 2003, when the Legislature passed Senate Bill 337 (SB 337). SB 337 added six new subsections (including the 180-day notice provision at issue here), which were designed to further shield the tavern industry from liability and, correspondingly, to further limit the ability of victims to obtain remedies. *See* Laws of Montana, 2003, ch. 489. Several of the bill's proponents cited *Cusenbary v. Mortensen*, 1999 MT 221, 296 Mont. 25, 987 P.2d 351, as justification for the amendments, and Stumble Inn likewise refers to Glen Mortensen's plight when explaining the purposes of the bill in its brief on appeal. Thus, before discussing the legislative proceedings on SB 337, it is necessary to address the *Cusenbary* decision and clarify its relevance.

¶85 On the evening of July 28, 1993, James Wells was driven by his niece to the Town Tavern in Great Falls, Montana. Wells had suffered a broken neck in an accident two years earlier; and although he had recovered to the point of being able to walk without a limp, he would lose control of his legs when he consumed alcohol. Wells was already intoxicated when he arrived at the Town Tavern, and several family members therefore assisted him from the vehicle into the bar, where Wells ultimately consumed about eight beers over a two-hour period. One patron who observed Wells thought that he was "very obviously" intoxicated and "in a bad mood." Wells shouted and yelled, and his speech was very slurred. Wells would get "real quiet and groggy down and explosively snap up and start barking at people." Another patron noticed Wells immediately after entering the bar because Wells was "loud, obnoxious, and acting intoxicated." This patron noted that Wells was arguing and talking loudly and was "obviously intoxicated." He also noticed

45

that Wells' speech was "very slurred" and hard to understand. Wells' family finally pushed him out of the tavern in his wheelchair and placed him in the passenger side of a vehicle. Wells then moved into the driver's seat, started the vehicle, and drove it through the tavern's south wall, injuring Jonathan Cusenbary (another patron). Wells later stated that he had no recollection of driving through the tavern wall and that he was "too intoxicated to exercise good judgment." Cusenbary filed suit against Mortensen (the owner of Town Tavern), and a jury returned a verdict against Mortensen in the amount of $750,000. *See Cusenbary*, ¶¶ 1, 7-11, 24.

¶86 On appeal, Mortensen argued that the trial court should have given his proposed jury instruction regarding his defense of superseding cause. He asserted that because Wells appeared to be physically incapable of driving a vehicle, it was not foreseeable to Mortensen or his employees that Wells would get into the driver's seat of a vehicle and injure someone. Mortensen claimed that Wells' act was a superseding cause of Cusenbary's injuries that broke the chain of causation and cut off Mortensen's liability. *See Cusenbary*, ¶¶ 22, 27. We disagreed, for two reasons. First, we observed that Wells' drunken conduct was not freakish, bizarre, or unpredictable as Mortensen claimed. Rather, we decided as a matter of law that his conduct was a reasonably foreseeable consequence of serving alcohol to a person who was already intoxicated. *Cusenbary*, ¶¶ 30-31. Citing *Nehring* and *Deeds*, we observed that it is reasonably foreseeable to those who dispense alcoholic beverages that serving a person who is already intoxicated may result in an accident or injury. *See Cusenbary*, ¶¶ 33-36. Second, we rejected Mortensen's attempt to write into the law an exemption under which a tavern owner may

46

serve unrestricted amounts of alcohol to a person who appears to the tavern owner or his employees to be incapable of driving a motor vehicle. We noted that § 27-1-710(3)(b), MCA, refers to a consumer who is "visibly intoxicated," regardless of that person's known or assumed physical abilities. Obviously, such a person may cause harm to himself or to others through means other than driving. Furthermore, a bartender may not be qualified to assess accurately a person's physical abilities. For these reasons, the only subjective symptoms an alcohol purveyor is required to interpret are those which indicate visible intoxication. If the person is "visibly intoxicated," he should not be served. The fact that the person seems physically incapable of driving is not part of the equation, and it certainly was not grounds for Mortensen and his staff to continue serving Wells in his visibly intoxicated condition. More to the point, we held that Mortensen's erroneous assumptions about Wells' physical abilities did not render Wells' later drunk driving any less of a reasonably foreseeable intervening cause of Cusenbary's injuries. In short, Mortensen and his bartenders could not blatantly disregard § 27-1-710(3)(b), MCA, and then argue that their actions were not a proximate cause of Cusenbary's injuries because they wrongly assumed that Wells was a quadriplegic. *See Cusenbary*, ¶¶ 37-39.

¶87 We also held that the trial court properly excluded evidence of Wells' criminal convictions for driving through the tavern wall. *Cusenbary*, ¶¶ 40-45. The 2003 Legislature responded to this particular holding by enacting § 27-1-710(9), MCA, which states that "[e]vidence of intentional or criminal activity by a person causing injury in connection with any event or injury commenced pursuant to this part is admissible in any action brought pursuant to this section." The Legislature also enacted provisions barring

47

the consumer of the alcoholic beverage from bringing suit (with two narrow exceptions), declaring that the fact-finder may consider the consumption of the alcoholic beverage in determining the cause of the plaintiff's injuries, and placing limits on the amount of damages recoverable ($250,000 caps on noneconomic damages and punitive damages). *See* § 27-1-710(4), (5), (7), (8), MCA. None of these amendments are at issue here.

¶88 Rather, this case concerns the 180-day notice provision codified at § 27-1-710(6), MCA. As noted, the proponents of SB 337 cited *Cusenbary* as evidence of an alcohol purveyor's need for early notice that he is going to be sued. Indeed, Mortensen told the legislative committees that his ability to present a defense in *Cusenbary* was impaired in part because Cusenbary commenced the action almost three years after Wells drove through the wall and Mortensen, at that point, could not locate witnesses. It is necessary here to point out, however, that nowhere in his briefs in *Cusenbary* did Mortensen present the argument that he was unable to mount an effective defense due to the timing of Cusenbary's filing. That was never raised as an issue on appeal, and it does not appear that Mortensen raised any sort of untimeliness defense (such as laches) in the trial court either. Rather, his defense was that Wells' drunk driving was a superseding cause which broke the chain of causation. This defense failed not because Mortensen couldn't locate witnesses or because evidence had been lost. It failed because Wells' drunk driving was a foreseeable intervening cause of Cusenbary's injuries. There was ample evidence that Wells had been "visibly intoxicated" in the tavern, and Mortensen was fully able to explain to the jury why he and his employees kept serving alcoholic beverages to Wells in that condition (they thought he was a quadriplegic). Furthermore, Mortensen's claim

48

that he did not have access to certain witnesses is belied by the fact that Wells' sisters testified by deposition. *See Cusenbary*, ¶ 55. Bottom line, the *Cusenbary* decision is not evidence that receiving early notice of a plaintiff's intent to sue is essential to a tavern owner's ability to prepare her defense—the proponents' misstatements about the decision notwithstanding—and Mortensen's testimony to the Legislature about why his defense in that case failed was misleading (if not an outright misrepresentation).

¶89 Turning now to the legislative proceedings on SB 337, various organizations and individuals spoke in favor of the bill. The Montana University System supported it. So did Downtown Helena, Inc. Likewise, the Montana Tourism Coalition, the Montana Innkeepers Association, the Montana Chamber of Commerce, the Helena Chamber of Commerce, the National Federation of Independent Businesses, and the Montana Beer and Wine Wholesalers Association all supported it. Several tavern operators offered their support, including Ralph Ferraro (Rocking R Bar, Bozeman), Bob Fletcher (Cannery Lounge, Bozeman), and Rick Flotkoetter (Texas Club, Miles City). So did the insurance industry representatives, including John Hayes (Talbot Insurance Agency), Jacqueline Lenmark (American Insurance Association), and Scott Tuxbury (Big Sky Underwriters). Many of the proponents cited concerns over "skyrocketing" costs and limited availability of liquor liability insurance—the very concern that the 1986 legislation supposedly addressed. Some proponents also cited "responsibility." For example, the representative from the Montana Beer and Wine Wholesalers Association stated that SB 337 "fits in with the wholesalers' platform of responsible consumption of our products. Don't drive drunk, and if you drive drunk, you should not be rewarded by being able to sue the bar."

49

Similarly, the representatives from the Montana Chamber of Commerce, the Helena Chamber of Commerce, and the Montana Innkeepers Association argued that people should take responsibility for their actions and that SB 337 puts responsibility "where it belongs."[9] Notably, as in 1986, none of the proponents discussed Montana's culture of alcohol abuse and the carnage on its highways caused by drunk drivers. Nor did any of them advocate for society's interest in preventing alcohol-related injuries and victims' right to obtain a just remedy. Rather, they quite remarkably painted *the tavern industry* as the victim and increased immunity as the remedy.

¶90 With respect to the 180-day notice provision specifically, it is important to note here that the generally applicable statute of limitations for tort actions is three years. In other words, negligence defendants are subject to suit for three years after the plaintiff is injured. *See* §§ 27-2-102, -204, MCA. As it did in 1986, however, the tavern industry decided that the rules applicable to everybody else should not be applicable to purveyors of alcoholic beverages. Specifically, the industry and its supporters sought a shorter statute of limitations of two years. As an alternative to this, they argued that they should be given early notice of a plaintiff's intent to sue. The Legislature, evidently all too willing to oblige, granted them both—i.e., their own special two-year statute of limitations *and* their own special early-notice provision. *See* § 27-1-710(6), MCA.

---

[9] The fact is, however, that SB 337 did exactly the opposite: It made it easier for negligent alcohol purveyors to *avoid* responsibility for their actions. Even if the drunk driver should not be allowed to sue the bar, it does not follow that *the victim* of the drunk driver should not be allowed to sue the bar. If taking responsibility for one's actions is what's important here, then the bar should be held accountable for its role in giving a visibly intoxicated driver "a shot for a nightcap" or a fifth of vodka and a case of beer for the road.

¶91 As originally introduced, SB 337 contained the two-year statute of limitations but not the notice provision. As Senator Joe Tropila (the chief sponsor) explained this part of the bill to the Senate Business and Labor Committee, "it is about timeliness in making your claim against someone so that recollections are reasonably intact and witnesses are still available." He used Mortensen as an example of a defendant who was supposedly "handicapped" in presenting a defense because witnesses were long gone and memories had eroded. He argued that the two-year statute of limitations "gives plenty of time to plaintiffs to determine . . . they have been injured and to find out where the person causing the accident was drinking." In his concluding remarks, he stated that SB 337 is "a protection bill" for those in the business of dispensing alcoholic beverages.

¶92 Mark Staples from the Montana Tavern Association provided similar insights into the purpose of SB 337. He asserted that dram-shop cases "routinely" are filed "within days of the end of the statute of limitations" and the bar owner or social host is then "at a serious disadvantage" and has "a whale of a time trying to reconstruct the facts." Thus, he argued that the shorter, two-year limitations period was appropriate. Notably, Staples presented no evidence whatsoever that victims of negligent alcohol purveyors "routinely" wait until the last minute to spring their claims on unsuspecting defendants. Moreover, while *Cusenbary* was cited as an example of this practice, the fact is that Mortensen had no difficulty "reconstructing the facts" of why he and his bartenders continued to serve a visibly intoxicated Wells, as discussed above. In any event, Staples clarified that he was not asking for an early-notice provision, but that "if you want to leave [the statute of

limitations] at three years, then put a 180-day notice provision in there" requiring the plaintiff to give notice, within 180 days of the incident, of her intent to sue.

¶93 Senator Mike Sprague agreed that "[t]he sooner the better for evidence purposes." He emphasized that "all I'm concerned with here is saving the evidence." Senator Kelly Gebhardt then suggested that a clause requiring notice within 180 days be added. SB 337 was thereafter amended to include this clause, and it was transmitted to the House containing both the two-year statute of limitations and the 180-day notice provision.

¶94 In the House Business and Labor Committee hearing, Senator Tropila argued that the two-year statute of limitations "gives plaintiffs plenty of time to sue, but it isn't as long a time that those being sued are handicapped in their abilities to defend themselves because of missing witnesses and eroded memories." He further argued that alcohol purveyors should be notified early on that they are going to be sued "so that they may preserve the evidence and testimony from any and all witnesses before they disappear."

¶95 Mark Staples, in turn, advised the committee that under existing caselaw, if "you or I in our homes or backyards, or a server in a lounge, serves a person who is tipsy, . . . anything after that, no matter how unforeseen and how bizarre, falls back on the server as far as liability goes." Obviously, this alarmist proposition is a complete misstatement of our holding in *Cusenbary*.[10] Thereafter, Staples again offered the unsubstantiated view

---

[10] We did not hold that a purveyor of alcohol is liable for all drunken conduct, "no matter how unforeseen and how bizarre." Rather, we held on the *specific* facts presented that reasonable minds could reach but one conclusion: that Wells' conduct of driving a vehicle while intoxicated through the wall of Town Tavern was a foreseeable intervening cause that did not supersede or break the chain of causation between Mortensen's original negligence and Cusenbary's injury. *Cusenbary*, ¶ 39. It may be argued that the

that "these suits are filed on the last day of three years, your servers are gone, your witnesses are gone, anybody that could possibly exonerate you or lend you testimony is gone, and meanwhile they have spent three years preparing their side of the case." He concluded that "all we ask is that [the statute of limitations] be reduced to two years" and "that they have to give [the defendant] notice" within six months of an intent to sue.

¶96    Al Smith of the Montana Trial Lawyers Association was the lone voice of opposition to SB 337. He pointed out that "we have a severe problem with alcohol abuse in this state," and he argued that those in the business of serving alcoholic beverages have a "heightened responsibility" in this regard. He also pointed out that § 27-1-710, MCA, was already very limited in that a tavern is liable only if it served an alcoholic beverage to a person who the server knew or should have known was underage, to a person who was visibly intoxicated, or to a person who the server coerced or tricked into drinking the beverage. With regard to the proposal to give the tavern industry a special statute of limitations, Smith argued:

> I understand the reasons that have been given about wanting to shorten up the statute of limitations to two years. Well, in Montana we have a three-year statute of limitations for civil actions. Everybody else that is involved in civil actions in Montana has a three-year statute of limitations. And they all have the same problems with the same thing we talked about here, as far as locating witnesses, they are hard to get a hold of, difficult to get the proof that they want, that type of thing. But it is the same for everybody across the board for civil actions in Montana. There is no reason to make this a special case.

Smith made similar points about the 180-day notice provision. He also noted that some

foreseeability issue should have been submitted to the jury and not decided as a matter of law. *See Cusenbary*, ¶ 68 (Leaphart & Gray, JJ., dissenting). But *Cusenbary* does not stand for the totally exaggerated rule of foreseeability articulated by Staples.

tavern owners are on notice at the time the accident occurs that they need to interview witnesses and gather evidence—as Mortensen was when a visibly intoxicated Wells drove through the tavern wall and injured Cusenbary, and as Stumble Inn was when a visibly intoxicated Warren peeled out of its parking lot and crashed into Cary Rohlfs 157 feet later. Thus, a 180-day notice requirement would not need to apply in every case.

¶97 Smith's arguments went unrefuted. Indeed, absolutely no evidence was presented that purveyors of alcoholic beverages are unique or a class of their own, relative to other tort defendants, when it comes to locating witnesses, gathering evidence, and preparing a defense. In fact, no one even *argued* that the tavern industry is special in this regard, and any such argument would have been ludicrous in any event. Obviously, tavern owners are not the only defendants who might not be aware that an accident has occurred and that they need to prepare a defense. As noted earlier, product manufacturers easily fall into this category. So do many slip-and-fall defendants. Likewise, cases arising out of latent injuries are part of this class. But the point here is that no evidence whatsoever was produced to substantiate the tavern industry's claim that it was somehow a class of its own when it comes to preparing a defense. Indeed, the supposed "evidence" offered by the bill's proponents was false, misrepresented, or unsubstantiated.

¶98 Nevertheless, the Legislature gave the tavern industry what it wanted, and then some: a shorter statute of limitations *and* an early-notice provision. No other negligence defendants enjoy such special privileges. The Court states that the Legislature was acting "in its wisdom" (Opinion, ¶ 17)—although, as just noted, the evidence presented to lawmakers was anecdotal, misleading, and untrue. The Court also states that we have no

54

license to "psychoanalyze" the legislators (Opinion, ¶ 20)—although no psychoanalysis is involved in looking at the public record and pointing out, as a statement of irrefutable fact, that there was no evidence supporting the tavern industry's claim that it was a class of its own. The changes effected by SB 337 were simply another incremental, though giant step backward toward the "Neanderthal approach" of yesteryear, *Nehring*, 219 Mont. at 471, 712 P.2d at 1335, a "back-eddy running counter to the mainstream of modern tort doctrine," *Deeds*, 306 F. Supp. at 359 (internal quotation marks omitted).

## V. CONSTITUTIONAL ANALYSIS

¶99    At the outset of this analysis, it is necessary to address two points regarding the Court's approach. First, I disagree with the Court's statement that a person challenging the constitutionality of a statute bears the burden of proving it unconstitutional "beyond a reasonable doubt." Opinion, ¶ 7. The constitutionality of a statute is a question of law which we review for correctness, as the Court acknowledges. Opinion, ¶ 7. It is "incongruous" and "absurd" to apply the "beyond a reasonable doubt" standard of proof (typically reserved for factual issues) to a purely legal question. *See Oberson v. U.S. Dept. of Agriculture*, 2007 MT 293, ¶ 34, 339 Mont. 519, 171 P.3d 715 (Leaphart, Nelson, & Cotter, JJ., concurring). As suggested by Justice Leaphart, I would apply the "plain showing of unconstitutionality" burden in challenges reviewed for rational basis and would hold the State to its burden where the government must demonstrate that the challenged statute withstands middle-tier or strict scrutiny analysis. *Oberson*, ¶ 37.

¶100   Second, I am unsure what to make of the Court's nebulous statement in ¶ 18 that it is not our function to "second-guess" the Legislature. Since this statement follows the

55

Court's peculiar fawning in ¶ 17 over the Legislature's "wisdom" in enacting the 180-day notice provision, the Court could be saying that it is not our function to examine the validity of treating dram-shop plaintiffs and defendants as a special class—a proposition with which I do not agree. In any event, whatever the Court's meaning, I note that it also is not our function to "rubber-stamp" the Legislature—as the Court effectively does here. Rather, it is our function to protect and uphold constitutional rights. *See e.g. Oberson*; *Snetsinger v. Montana University System*, 2004 MT 390, 325 Mont. 148, 104 P.3d 445; *Walker v. State*, 2003 MT 134, 316 Mont. 103, 68 P.3d 872; *Armstrong v. State*, 1999 MT 261, 296 Mont. 361, 989 P.2d 364; *Gryczan v. State*, 283 Mont. 433, 942 P.2d 112 (1997); *Davis v. Union Pacific R.R. Co.*, 282 Mont. 233, 937 P.2d 27 (1997); *State v. Siegal*, 281 Mont. 250, 934 P.2d 176 (1997).

¶101 Here, the Rohlfs cite Article V, Section 12 of Montana's 1972 Constitution in arguing that the 180-day notice provision is unconstitutional. This provision states that "[t]he legislature shall not pass a special or local act when a general act is, or can be made, applicable." Article V, Section 26 of Montana's 1889 Constitution contained a substantially similar prohibition.

¶102 A special statute is

> one which relates to particular persons or things of a class, or one made for individual cases and for less than a class, or one which relates and applies to particular members of a class, either particularized by the express terms of the Act or separated by any method of selection from the whole class to which the law might, but for such limitation, be applicable.

*State ex rel. Redman v. Meyers*, 65 Mont. 124, 127, 210 P. 1064, 1065-66 (1922) (citations omitted); *accord Lowery v. Garfield County*, 122 Mont. 571, 587, 208 P.2d

478, 487 (1949). Unconstitutional class legislation "includes all laws that rest upon some false or deficient classification, and the vice in such laws is that they do not embrace all of the class to which they are naturally related." *Leuthold v. Brandjord*, 100 Mont. 96, 105, 47 P.2d 41, 45 (1935). "It is not, therefore, what a law includes, but what it excludes, that determines whether it is special." *Redman*, 65 Mont. at 127, 210 P. at 1066. A law makes an improper discrimination if it confers particular privileges or imposes peculiar disabilities upon a class of persons arbitrarily selected from a larger number of persons all of whom stand in the same relation to the privileges conferred or the disabilities imposed. *Leuthold*, 100 Mont. at 105, 47 P.2d at 45. Special laws are objectionable "for not extending to the whole subject to which their provisions would be equally applicable, and thus permitting a diversity of laws relating to the same subject." *Leuthold*, 100 Mont. at 105-06, 47 P.2d at 45 (internal quotation marks omitted).

¶103 In *Redman*, this Court struck down § 1038, RCM (1921), as special legislation. Section 1038 stated that all school districts which have been or may be divided by the creation of a new county under the New County Acts are joint school districts subject to the laws relating to the management and control of joint school districts. Section 1038 operated only upon existing districts divided by the creation of new counties, and only such new counties as had been or might be created under the New County Acts. It excluded from its operation all existing districts which had been or might be divided by the creation of new counties by direct legislative enactment. But the fact that § 1038 applied only to some school districts did not necessarily render it invalid. Rather, the question was whether the law "operate[d] equally upon all of a group of objects which,

57

having regard to the purpose of the legislature, are distinguished by characteristics sufficiently marked and important to make them a class by themselves." *Redman*, 65 Mont. at 128, 210 P. at 1066. Applying this test, the Court observed that

> [t]here is not any difference in the situation or circumstances of a school district divided by the creation of a new county under the New County Acts and one divided by the creation of a new county by direct legislative enactment. The first is included in the operation of section 1038, and the last is excluded, apparently without any reason, and in the absence of anything which distinguishes the excluded districts from those included. . . . Section 1038 is a special statute under all of the authorities, and the attempted classification found in it is purely arbitrary and artificial.

*Redman*, 65 Mont. at 128-29, 210 P. at 1066. The Court further concluded that a general law could be made applicable: the general statute for the creation of joint school districts. Thus, the Court held that § 1038 was void. *Redman*, 65 Mont. at 129-30, 210 P. at 1066.

¶104 In *Lowery*, this Court likewise struck down Chapter 100, Laws of 1943, as special legislation. Under § 9024, RCM (1935), a party claiming adverse possession must show that the land has been occupied and claimed continuously for a period of ten years and that the party or her predecessors, during such period, have paid all taxes levied upon said land. For those claiming right under a tax deed, however, Chapter 100 reduced the period of possession by eight years and eliminated the requirement that taxes be paid during the period of adverse possession. After reciting the rules for determining whether a statute is special legislation, the Court concluded that

> Chapter 100, Laws of 1943, is clearly a special law. It applies to certain persons and individuals and leaves all others in the same circumstances subject to the provisions of the general statute on adverse possession. The right of the legislature to shorten the Statute of Limitations for the period of adverse possession is not questioned but it must apply to all classes claiming adversely and the same requirements during the period of adverse

58

possession must be required of all persons and classes.

*Lowery*, 122 Mont. at 588, 208 P.2d at 487.

¶105 The 180-day notice provision is unconstitutional for the same reasons the *Redman* and *Lowery* statutes were. First, as to the classification at issue here, Stumble Inn argues that we should define the class narrowly as just "those persons that might be impacted by alcohol service claims." Essentially, Stumble Inn would define the class as dram-shop plaintiffs and defendants. Stumble Inn then argues that because all such plaintiffs are equally disadvantaged by the notice provision, and because all such defendants are equally benefited by it, the provision is not special legislation. This approach, however, is pure sophistry. If the relevant class for special legislation analysis were simply the class encompassed by the legislation, then a special legislation challenge would never succeed. *Cf. Yeoman v. Commonwealth*, 983 S.W.2d 459, 468 (Ky. 1998) ("This Court will not permit a statute to survive [a challenge that it is special legislation] by simply defining a class in a narrow fashion which will yield, ipso facto, a self-sustaining classification."). Notably, we rejected this same approach in *Oberson v. U.S. Dept. of Agriculture*, 2007 MT 293, 339 Mont. 519, 171 P.3d 715, where the Forest Service argued that the "legislature here treated all snowmobilers identically, and thus created no distinction or classification that warrants equal protection review." *Oberson*, ¶ 18. We noted that the general class is defined as those who are similarly situated with respect to the governmental purpose. *See Oberson*, ¶ 19; *cf. Leuthold*, 100 Mont. at 105, 47 P.2d at 45 (defining the general class as all persons who stand in the same relation to the privileges conferred or the disabilities imposed by the challenged law). The statute at

issue in *Oberson* sought to prevent frivolous lawsuits by immunizing snowmobile area operators from the inherent risks of the sport over which the operator had no control. Yet, all operators who provide a venue for an inherently dangerous sport are similarly situated with respect to the mischief the statute proposed to remedy. Thus, we held that the snowmobile liability statute classified snowmobile area operators and snowmobilers and treated them differently from other similarly situated groups. *Oberson*, ¶ 20.

¶106 Here, the purpose of the law is to alert an otherwise unaware dram-shop defendant that an accident for which he may bear some liability has occurred within the previous six months and that the victim intends to sue. That way, the defendant knows to interview witnesses before they disappear or their memories degrade, to gather and preserve evidence, and to prepare a defense. Given this purpose, I agree with the Court's observation that the 180-day notice provision distinguishes defendants directly involved in the incident causing damage from defendants who are not present and may not be aware that an incident occurred until being served with a complaint. Opinion, ¶ 18.

¶107 The question, then, is whether the 180-day notice provision "embrace[s] all of the class to which [it is] naturally related" or whether it "confers particular privileges or imposes peculiar disabilities upon a class of persons arbitrarily selected from a larger number of persons all of whom stand in the same relation to the privileges conferred or the disabilities imposed." *Leuthold*, 100 Mont. at 105, 47 P.2d at 45. As noted, a variety of tort defendants are similarly situated with respect to the mischief the 180-day notice provision proposes to remedy. Product manufacturers and slip-and-fall defendants, as well as snowmobile area operators, are but three examples of defendants who are "not

60

present and may not be aware that an incident occurred until being served with a complaint" (Opinion, ¶ 18). Yet, the 180-day notice provision does not embrace these defendants. These defendants, rather, are subject to the generally applicable statute of limitations and do not enjoy the benefit of a 180-day notice provision. Conversely, the plaintiffs in those cases are not subject to the added notice requirement. It must also be reiterated here that no evidence was presented to the Legislature substantiating the tavern industry's claim that alcohol purveyors are in a class of their own vis-à-vis the difficulties in defending against a claim arising out of an incident at which the defendant was not present.[11]

¶108 In sum, the 180-day notice provision applies to certain persons and entities and leaves all others in the same circumstances subject to the provisions of the general statute of limitations. *Cf. Lowery*, 122 Mont. at 588, 208 P.2d at 487. Indeed, Senator Tropila testified that SB 337 is "a protection bill" for those in the business of dispensing alcoholic beverages. The notice provision classifies dram-shop defendants and confers on them a special privilege not enjoyed by similarly situated defendants. Conversely, it imposes a peculiar disability on a class of persons (dram-shop plaintiffs) arbitrarily selected from a larger group of similarly situated persons (plaintiffs injured by absent defendants who are unaware of the incident). Yet, there is no evidence that the three-year statute of limitations generally applicable to all such absent defendants cannot be made

---

[11] In this regard, the Rohlfs point out that contrary to Stumble Inn's flagrant misrepresentations of the legislative record, only one proponent of SB 337 (Mortensen) claimed to have been prejudiced by the disappearance of witnesses, and that claim was an inaccurate and misleading explanation of why his defense in *Cusenbary* failed.

applicable to dram-shop defendants. I consequently would hold that the notice provision is unconstitutional special legislation in violation of Article V, Section 12.

¶109 In reaching the opposite conclusion, the Court's analysis founders due largely to the Court's confusion about the class at issue here. Initially, the Court correctly identifies the class as tort plaintiffs bringing claims against defendants who were not present at the injury-causing incident and, thus, may not be aware that the incident occurred until being served with a complaint. Opinion, ¶ 18. But then the Court defines the class narrowly as tort plaintiffs seeking redress under the Dram Shop Act. Opinion, ¶ 19. Based on this latter classification, the Court reasons that because all dram-shop plaintiffs are "uniformly and equally" disadvantaged by the notice provision, the provision is not special legislation. Opinion, ¶ 19. This approach is incorrect for two reasons.

¶110 First, the Court errs by defining the class in such a fashion as to yield a self-sustaining classification—i.e., by defining the class as those who are burdened by the challenged law and then upholding the law because it discriminates against all of these people "uniformly and equally." Our caselaw makes clear that the relevant class consists of all persons who are similarly situated with respect to the law's purpose—a point the Court seems to recognize in ¶ 18 but then inexplicably ignores in ¶ 19. *See Oberson*, ¶ 19; *Leuthold*, 100 Mont. at 105, 47 P.2d at 45. The relevant class here, therefore, is not dram-shop plaintiffs; it is all tort plaintiffs injured by an absent defendant who is unaware of the injury-causing incident. The notice provision arbitrarily singles out dram-shop plaintiffs and treats them differently from these similarly situated tort plaintiffs.

¶111 Second, the Court's approach is based on the fundamentally mistaken proposition that a cause of action against a purveyor of alcoholic beverages is "a statutory claim" or "utilize[s] a statutory scheme." Opinion, ¶ 19. As explained above, dram-shop liability developed under the common law. Thus, a plaintiff does not "seek[ ] redress under the Dram Shop Act." Opinion, ¶ 19. Rather, a dram-shop claim is simply a common law negligence action against a purveyor of alcoholic beverages. Notably, the author of today's Opinion recognized this fact just last year in his Opinion for the Court in *Filip v. Jordan*, 2008 MT 234, 344 Mont. 402, 188 P.3d 1039, where he wrote:

> The Legislature has plenary power to alter common law causes of action, but this is not the same as saying that when the Legislature does so the resulting cause of action is created by statute. . . . [T]he test for whether a liability is created by statute is whether liability would exist absent the statute in question. In this instance, as noted above, Montana recognized a cause of action based on negligently providing alcohol to an intoxicated person prior to the passage of § 27-1-710, MCA (1999). *See Nehring*, 219 Mont. 462, 712 P.2d 1329 . . . . Thus, § 27-1-710, MCA (1999), did not "establish[ ] a new rule of private right unknown to the common law."

*Filip*, ¶¶ 12-13 (second brackets in *Filip*, paragraph break omitted). Indeed, § 27-1-710, MCA, simply placed limits (regarding causation, proof, and recoverable damages) on an existing common law cause of action. Thus, the Court's premise in ¶ 19 that dram-shop plaintiffs are somehow a class of their own because they are utilizing a statutory scheme is incorrect, and the entire foundation of the Court's special legislation analysis crumbles—as it should. The 180-day notice provision is special legislation.

## VI. THE COURT'S EQUAL PROTECTION ANALYSIS

¶112 Given my conclusion that § 27-1-710(6), MCA, is special legislation, I would not reach the Rohlfs' alternative argument that this provision violates Article II, Section 4's

63

Equal Protection Clause. But since the Court has addressed the equal protection issue, I note two points about the Court's analysis. First, I do not agree with the Court's reliance on *Meech v. Hillhaven West, Inc.*, 238 Mont. 21, 776 P.2d 488 (1989). The Court's citations to *Meech* are inapt for purposes of resolving the issues presented in this case. Second, I disagree with the Court's statements in ¶ 29 that the notice provision does not involve a fundamental right and that strict scrutiny is not required. As the Court acknowledges in ¶¶ 27 and 29, the notice provision hinders the right of access to the courts. That right is guaranteed by Article II, Section 16, which states that "[c]ourts of justice shall be open to every person, and speedy remedy afforded for every injury of person, property, or character." This Court has held repeatedly that the rights enumerated in Article II of Montana's Constitution (the Declaration of Rights) are fundamental constitutional rights. *Kortum-Managhan v. Herbergers NBGL*, 2009 MT 79, ¶ 25, 349 Mont. 475, 204 P.3d 693 (citing cases); *Wadsworth v. State*, 275 Mont. 287, 299, 911 P.2d 1165, 1172 (1996). Hence, as Article II, Section 16 is contained in the Declaration of Rights, it necessarily follows that it is a fundamental right to which strict scrutiny applies. *See Snetsinger v. Montana University System*, 2004 MT 390, ¶ 17, 325 Mont. 148, 104 P.3d 445 ("Strict scrutiny applies if a . . . fundamental right is affected."). And for these reasons, I would overrule the statements in *Linder v. Smith*, 193 Mont. 20, 25-26, 629 P.2d 1187, 1190 (1981), on which the Court relies in ¶ 29, that "access to the courts is not an independent fundamental right" and "access may be hindered if there exists a rational basis for doing so."

## VII. CONCLUSION

64

¶113 Stumble Inn served alcoholic beverages to a visibly intoxicated patron who then got into his car and, a quick 157 feet of burnt rubber later, smashed into Cary Rohlfs, causing Cary serious injuries. Stumble Inn knew about the accident; Stumble Inn knew that its patron was involved; Stumble Inn knew (or should have known) that Cary might sue the tavern for its negligent conduct; and Stumble Inn knew (or should have known) that it needed to start interviewing witnesses and preserving evidence. Stumble Inn does not contend that it is unable to mount a defense to the Rohlfs' claims. Rather, Stumble Inn seeks to deny the Rohlfs their day in court, and seeks to avoid having to answer for its actions, simply because the Rohlfs did not mail a notice of intent to sue within 180 days of the accident. The Rohlfs' observation that § 27-1-710(6), MCA, is "a gratuitous windfall for the tavern industry" is well-taken on the facts presented here.

¶114 The Court characterizes the lawmakers who enacted the 180-day notice provision as the "people's representatives." Opinion, ¶ 33. It is doubtful that the Rohlfs and other victims of drunk drivers will share this view; more likely, they will view them as the "alcohol purveyor's representatives." As the historical account of dram-shop liability reveals, the Legislature has readily obliged the tavern industry's demands (and those of certain event sponsors, such as the Montana Chamber of Commerce, the Helena Chamber of Commerce, the Montana University System, and Downtown Helena, Inc.) for exemptions from the common law rules of negligence applicable to everyone else. Indeed, the tavern industry and its supporters have been immensely successful in stemming the tide of modern tort doctrine with legislatively conferred privileges and immunities over the past 24 years. And with each new special protection, the

accountability of those who sell or furnish intoxicating beverages lessens and the law governing dram-shop liability concomitantly regresses. Indeed, the present policy of protecting purveyors of alcohol at the expense of the victims of drunk drivers can only be characterized as "Neanderthal."

¶115 Meanwhile, ironically, the Legislature is presently agonizing over Montana's "culture" and "deadly tradition" of alcohol abuse and drunk driving. Yet, one of the factors contributing to this problem is staring lawmakers in the face: alcoholic beverages are still being sold or furnished to underage and visibly intoxicated consumers. Those who do so should be held accountable for such conduct, but instead they are allowed to hide behind legislatively conferred special protections—as the present case illustrates. In this regard, when it comes to stopping drunk driving and unlawful sales of alcohol, there has been much discussion of harsher penalties for drunk drivers, mandatory treatment programs for these offenders, and increased regulation of alcohol purveyors. *See generally* Editorial, *Changing Minds – and Laws: Legislators Give their Responses on Ways to Stop Drunken Driving, Sales to Minors*, Missoulian (Dec. 6, 7, and 8, 2009). Left out of this discussion entirely, however, is holding alcohol purveyors accountable *to the victims of drunk drivers* by putting such victims back on the same footing as other victims of negligent conduct. Left out of this discussion is reversing the Legislature's approach of treating tavern owners and other alcohol purveyors as special businesses in need of special protections through special legislation. Left out of this discussion is the Legislature's own historic and continuing contribution to Montana's culture and deadly tradition of alcohol abuse and drunk driving.

¶116　As one citizen recently observed: " 'Our highways are paved in blood. It's time to change that.' " *See* Kris Minard, Editorial, *Time to Stop Tolerating Driving Drunk*, Helena Independent Record 4A (Dec. 15, 2009) (quoting an individual who spoke about the Department of Revenue's proposal to weaken penalties for bars, casinos, and stores that illegally sell alcohol to minors). In this spirit, perhaps the lesson to be learned from cases like *Deeds*, *Nehring*, *Cusenbary*, and the instant action is not that the tavern industry needs all the protections that the Legislature has lavished on it, but that alcohol purveyors need to shoulder their share of responsibility for the carnage on our highways. Indeed, as the widow of the Highway Patrolman recently testified, "Our bartenders and servers are the first line of defense against drunken driving." Thus, those in the business of serving alcoholic beverages have a heightened responsibility, not a lesser one. Making them less accountable does not encourage them to be more responsible, as Stumble Inn's conduct on June 29 and 30, 2006, demonstrates.

¶117　The 180-day notice provision is "a protection bill" for those in the business of dispensing alcoholic beverages. It is a "back-eddy" running counter to the mainstream of modern tort doctrine. But most of all, it is special legislation benefiting and burdening a discrete group of persons while leaving all other similarly situated persons subject only to the provisions of the generally applicable statute of limitations. The Rohlfs have met their burden of making a "plain showing of unconstitutionality." I would reverse the District Court's contrary decision and remand for a trial.

¶118　I dissent.

/S/ JAMES C. NELSON

67